**Electronically Filed
Supreme Court
SCWC-13-0000133
15-JUN-2018
09:16 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

WELLS FARGO BANK, N.A. AS TRUSTEE FOR OPTION ONE MORTGAGE LOAN
TRUST 2007-4 ASSET-BACKED CERTIFICATES, SERIES 2007-4,
Petitioner/Plaintiff-Appellant,

vs.

DANIEL TSUKASA OMIYA,
Respondent/Defendant-Cross-Claimant-Appellee,

and

ASSOCIATION OF APARTMENT OWNERS OF ILIKAI APARTMENT BUILDING,
Defendant/Cross-Claim Defendant-Appellee.

SCWC-13-0000133

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0000133; CIVIL NO. 10-1-2345)

JUNE 15, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

Under Hawai‘i law, in the case of non-judicial

foreclosure of real property registered with the Land Court, the

mortgagor or other person in interest may directly impeach the

foreclosure proceedings affecting the property prior to the entry of a new certificate of title.  However, after a new certificate of title has been entered, no judgment recovered on the mortgage note for any balance due shall operate to open the foreclosure or affect the title to the registered property (with some exceptions for fraud).

This case concerns whether a certificate of title is entered when a deed is accepted by the Office of the Assistant Registrar of the Land Court and stamped with a new certificate of title number.  Because we conclude that assignment of a new certificate of title number is not the statutory equivalent of an entry of a certificate of title, we hold that the evidence did not establish that a certificate of title had been entered. Accordingly, the plaintiff in this case was not barred from maintaining an action against the purchaser-defendant for recovery of the foreclosed property.  Additionally, because the evidence presents an issue of material fact as to whether the foreclosure sale was conducted through reasonable means to secure an adequate purchase price, we vacate the grant of summary judgment and remand the case for further proceedings.

## I.    BACKGROUND

Wells Fargo, N.A. (Wells Fargo) foreclosed via a non-judicial foreclosure sale on its mortgage lien against apartment unit 1731 (Property), located in the Ilikai Apartment Building

in Honolulu, Hawaiʻi.  Wells Fargo paid $318,750.00 for the Property, and a mortgagee quitclaim deed was recorded in the Office of the Assistant Registrar of the Land Court in favor of Wells Fargo on March 30, 2009.

Thereafter, another non-judicial foreclosure sale was held on August 18, 2010 by the Association of Apartment Owners of Ilikai Apartment Building (AOAO) at which Daniel Tsukasa Omiya purchased the Property for $15,000.[1]  According to the filings, the AOAO foreclosed on the Property to recover maintenance fees the AOAO claimed it was owed.[2]  The AOAO executed a quitclaim deed to Omiya which was accepted in the Office of the Assistant Registrar on September 15, 2010 and bears a stamp that reads in relevant part as follows:

> STATE OF HAWAII
>
> OFFICE OF ASSISTANT REGISTRAR
>
> RECORDED
> SEP 15, 2010      08:01 AM
>   Doc No(s) 3999421
>   on Cert(s) 940,974

---

[1]    The record does not indicate if there were competing bids to purchase the Property.

[2]    The quitclaim deed that the AOAO executed to Omiya after the foreclosure sale states that the AOAO had exercised foreclosure rights under a power of sale based, in part, on Hawaii Revised Statutes (HRS) § 514B-146. That section provides in relevant part that "[a]ll sums assessed by the association but unpaid for the share of the common expenses chargeable to any unit shall constitute a lien on the unit with priority over all other liens" with some enumerated exceptions.  HRS § 514B-146(a) (Supp. 2016).  The statute further specifies that "[t]he lien of the association may be foreclosed by action or by nonjudicial or power of sale foreclosure procedures set forth in chapter 667."  Id.

Issuance of Cert(s) 996,234

## A. Circuit Court Proceedings

### 1. Wells Fargo's Complaint

On November 3, 2010, Wells Fargo filed a complaint against Omiya and the AOAO in the Circuit Court of the First Circuit (circuit court), alleging that the sale of the Property to Omiya was not conducted in accordance with applicable Hawai'i law because, inter alia, Omiya did not pay reasonable value for the Property.[3] The complaint also stated that Omiya

> claims to the be owner of the Property by virtue of that certain Quitclaim Deed filed on September 15, 2010 . . . in the Office of the Assistant Registrar of the Land Court, State of Hawaii which resulted in the issuance of Transfer Certificate of Title No. 996,234 registering title in the name of Defendant Omiya.

In addition to other relief, Wells Fargo asked that the Assistant Registrar of the Land Court be directed to take such action as necessary to restore legal title to Wells Fargo, including but not limited to, cancellation of Transfer Certificate of Title (TCT)[4] No. 996,234. Omiya answered and filed a cross-claim against the AOAO.

---

[3]     The Honorable Edwin C. Nacino presided.

[4]     HRS Chapter 501 refers to the initial certificate of title issued pursuant to the Land Court's decree of registration as an "original certificate of title," see, e.g., HRS § 501-75 (2006), and refers to a subsequent certificate of title issued to a new owner following the conveyance of previously registered property as a "new certificate of title." See, e.g., HRS § 501-108 (2006 & Supp. 2016). Although the terms do not appear in HRS Chapter 501, the Rules of the Land Court refer in some instances to a new certificate of title as a "transfer certificate of title" or TCT. See Rules of the Land Court (RLC) Rules 14, 26 (1989).

4

### 2. Omiya's Summary Judgment Motion

On December 21, 2011, Omiya filed a motion for summary judgment asserting that the quitclaim deed to Omiya was recorded and the Land Court had issued TCT No. 996,234. Thus, according to Omiya, Wells Fargo's arguments to invalidate the AOAO's foreclosure sale were untimely because they were not raised before the issuance of the new certificate of title, which was final and binding. (Citing Aames Funding Corp. v. Mores, 107 Hawai'i 95, 103, 110 P.3d 1042, 1050 (2005).) As a result, Omiya argued, no relief could be obtained against him or the Property because he was statutorily protected as a subsequent purchaser for value.[5] (Citing Hawaii Revised Statutes (HRS) § 501-82 (Supp. 2016).)[6]

In its opposition to the summary judgment motion, Wells Fargo asserted that there was a genuine issue of material fact as to whether a new certificate of title had issued. Wells Fargo pointed to the declaration of its counsel Anya Perez

---

[5]      In the alternative, Omiya argued that Wells Fargo should be barred from opposing the motion for summary judgment or that the court should dismiss Wells Fargo's complaint based on its failure to comply with its discovery obligations.

[6]      HRS § 501-82(a) provides in relevant part as follows: "Every applicant receiving a certificate of title in pursuance of a decree of registration, and every subsequent purchaser of registered land who takes a certificate of title for value and in good faith, hold the same free from all encumbrances except those noted on the certificate" subject only to enumerated exceptions that are not relevant here.

5

(Perez Declaration), which stated that she went to the Office of the Assistant Registrar of the Land Court and, after searching its computer records, was able to see that the new certificate of title was only partially prepared. The certificate of title was not complete and not certified, Perez averred, because the legal description was missing. Perez further declared that a staff person at the office initially told her that a new TCT No. 996,234 had been issued, "because it is certified by [the quitclaim deed]." The staff member went on to explain, Perez averred, that the certificate of title had not been checked and signed by an assistant registrar, which was required for the certificate of title to be certified.

Wells Fargo also asserted that there was a genuine issue of material fact as to whether the sale price was adequate. Wells Fargo again pointed to the Perez Declaration, which stated that, based on a 2012 tax assessment found in an online search of the City and County of Honolulu's Real Property Assessment and tax billing information website, the assessed value of the Property as of October 1, 2011 was $308,300.00. A copy of the search results was attached to the Perez Declaration.[7]

_____

[7] Wells Fargo additionally submitted that there were genuine issues of material fact as to the following: whether Wells Fargo was paying fees for the Property; whether the AOAO gave proper notice of foreclosure; whether

(continued . . .)

Omiya countered that the tax assessed value of the Property found on the internet was inadmissible hearsay and an unqualified expert opinion. As to whether a new certificate of title was issued, Omiya maintained that the complaint admitted that the filing of the quitclaim deed in the Office of the Assistant Registrar resulted in the issuance of TCT No. 996,234, registering title in Omiya's name. Additionally, Omiya asserted that the lack of a physical hard copy of a certificate of title was merely the result of clerical or bureaucratic delay and that "treating an issued certificate of title as ineffective" would result in arbitrary and inconsistent Land Court protections, which was contrary to the intent of the Land Court statute.[8]

Omiya submitted a supplemental declaration by Sandra Furukawa, a title insurance provider who formerly served as Registrar of the Bureau of Conveyances and Assistant Registrar

---

(. . . continued)

Omiya was the highest bidder; whether the auction took place in a manner as required by law; and whether the sale was commercially reasonable.

[8]     The hearing on the motion was scheduled for January 19, 2012. At the hearing, the court questioned Wells Fargo regarding its position as to whether there was a judicial admission in the complaint. Wells Fargo acknowledged the language in the complaint cited by the court and orally requested leave to amend the complaint, arguing that the record was clear that a new certificate of title had not been issued. The court stated that it was not going to allow Wells Fargo to amend the complaint for the purpose of the summary judgment motion because the motion to amend was not before the court. The court continued the hearing to allow additional briefing. Wells Fargo then filed a non-hearing motion for leave to amend its complaint on January 23, 2012, so as to remove the language referring to the issuance of a TCT number. On February 1, 2012, the court denied the motion.

of the Land Court (Furukawa Declaration). Furukawa stated that the Office of the Assistant Registrar of the Land Court at that time was nearly four years behind in physically producing and certifying new certificates of title for properties registered in the Land Court system.

Wells Fargo filed a supplemental memorandum, asserting that the rule that the certificate of title is conclusive is predicated on the ability of an interested person to inspect the actual, physical document at will. Wells Fargo argued that Omiya had not presented a certificate of title as defined by the Rules of the Land Court (RLC) Rule 52 (1989), which provides that a "[c]ertificate means a certificate of title showing the owner's name, a description of the land and a summary of encumbrances affecting the land, if any." Because a certificate of title had not been issued, Wells Fargo contended, it was not prevented from challenging the non-judicial foreclosure.

Following a further hearing on the summary judgment motion, the circuit court framed the dispositive issue as whether "the issuance of the TCT number is sufficient" to provide Omiya with statutory protection. The court concluded that "there's no genuine issue of material fact regarding" whether Omiya was protected and thus granted the summary judgment motion in favor of Omiya.

The court issued an order granting summary judgment and an amended partial final judgment. Wells Fargo filed a timely notice of appeal to the Intermediate Court of Appeals (ICA).

### B.    ICA Proceedings

On appeal, Wells Fargo contended that the circuit court erred in (1) concluding that because a certificate number had been issued, this court's precedent prevented Wells Fargo from challenging the AOAO's foreclosure of the Property and (2) granting the summary judgment motion because the sale price of the Property shocked the conscience.[9]

In a memorandum opinion, the ICA held that the circuit court did not err in granting summary judgment because there was no genuine issue of material fact as to Omiya's ownership of the Property.[10] The ICA cited RLC Rule 59(d) (1989), which provides that in recording a deed, "the purchaser presents the deed which contains the proper number of the certificate of the land affected and also contains or has endorsed upon it a full

---

[9]    Wells Fargo also contended that the circuit court erred in granting the summary judgment motion as Wells Fargo provided evidence that it had been current in its payment to the AOAO for the condominium association fees at the time of the foreclosure. This point of error is not raised in the application for a writ of certiorari and is therefore not further addressed.

[10]    The ICA's memorandum opinion can be found at Wells Fargo Bank, N.A. v. Omiya, No. CAAP-13-0000133, 2017 WL 3140895 (Haw. App. July 24, 2017).

memorandum of all encumbrances affecting the land, if any." The ICA noted that Omiya followed this procedure by presenting the quitclaim deed to the Land Court. Pursuant to HRS § 501-107 (Supp. 2016), the ICA stated, the instrument is stamped with the date, hour, and minute of reception, and, with that, the instrument is regarded as registered from the date and time noted.

The ICA then pointed to HRS § 501-118 (2006), which precludes a mortgagor or other person in interest from impeaching foreclosure proceedings after the entry of a new certificate of title. The ICA concluded that Omiya was required only to show a TCT number stamped on the quitclaim deed record at the Land Court and not a physical certificate of title.

The ICA acknowledged that Wells Fargo's argument that issuance of a TCT number does not have the same effect as issuance of a physical TCT was not unreasonable. However, the ICA determined that, "under the circumstances of the Land Court's current operations" and in view of Wells Fargo's judicial admission that issuance of the TCT number had the effect of registering title in Omiya's name, any challenge to Omiya's title should have been initiated before the TCT number was issued to Omiya. The ICA accordingly held that Wells Fargo's purchase price argument was untimely because title

became conclusive and unimpeachable when the TCT number was issued.

Judge Ginoza dissented, arguing that there was conflicting evidence as to whether the transfer had been certified by the Land Court process, including (1) the quitclaim deed with a notation of the "Issuance of Cert(s) 996,234"; (2) the Perez Declaration attesting that Perez retrieved the certificate of title on a computer screen and that it was only partially prepared and not complete or certified because the legal description was missing; and (3) the Furukawa Declaration averring that the Office of the Assistant Registrar of the Land Court was nearly four years behind in physically producing and certifying new certificates of title. As to any judicial admission, the dissent reasoned that the statement in the complaint was not dispositive as the pertinent question under HRS § 501-118 is whether there has been entry of a new certificate of title. Thus, the dissent contended that there was a genuine issue of material fact that precluded summary judgment on this issue.

The dissent further concluded that there was a genuine issue of material fact as to whether the price was grossly inadequate. The dissent explained that mortgagees must "exercise their right to non-judicial foreclosure under a power of sale in a manner that is fair, reasonably diligent, and in

11

good faith, and to demonstrate that an adequate price was procured for the property." (Quoting Kondaur Capital Corp. v. Matsuyoshi, 136 Hawai'i 227, 240, 361 P.3d 454, 467 (2015).) In this case, the dissent contended, the quitclaim deed submitted by Omiya included an attachment indicating that in 2010 the assessed net value of the Property was $281,100. Based on this evidence, the dissent concluded there was a genuine issue of material fact as to the adequacy of the purchase price.[11]

## II. STANDARD OF REVIEW

This court reviews a court's grant or denial of summary judgment de novo. Querubin v. Thronas, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005).

## III. DISCUSSION

Wells Fargo presents two questions in its application for a writ of certiorari. The first question concerns whether the ICA gravely erred in affirming summary judgment when a new certificate of title had not been entered prior to Wells Fargo initiating this case. The second question involves whether the ICA gravely erred in affirming summary judgment as to the adequacy of the price paid by Omiya for the Property at the

---

[11] The ICA majority responded that the 2010 tax assessment was not argued by Wells Fargo as a basis for establishing that the foreclosure price was inadequate, and that the value of the Property in the separate 2012 tax assessment relied upon by Wells Fargo had "no bearing on the value of the Property at the time of Omiya's purchase in 2010."

12

foreclosure sale.  To address these questions, we first consider the framework of the Land Court system.

## A.  Certificate of Title

### 1.  The Land Court System

Hawai'i has two systems for recording title to real property, the Bureau of Conveyances and the Land Court. GGS (HI), Inc. v. N.Y. Diamond, Inc. (In re 2003 Ala Wai Blvd.), 85 Hawai'i 398, 405, 944 P.2d 1341, 1348 (App. 1997), overruled on other grounds, Knauer v. Foote, 101 Hawai'i 81, 63 P.3d 389 (2003).  The legislature created the Land Court with the passage of the Torrens Land Act (Act) in 1903, which is today codified in HRS Chapter 501 as amended.  1903 Haw. Sess. Laws Act 56, § 2 at 279.  The purpose of the system created by the Act "is to conclusively establish title to land through the issuance of a certificate of title."  Aames Funding Corp. v. Mores, 107 Hawai'i 95, 101, 110 P.3d 1042, 1048 (2005).  The holder of a certificate of title holds it "free from all encumbrances except those noted on the certificate in the order of priority of recordation" and other statutorily enumerated encumbrances.  HRS § 501-82(a) (Supp. 2016).  Thus, "a land court certificate of title is 'conclusive and unimpeachable' with regard to 'all matters contained therein,'" which is "[t]he fundamental difference between a certificate of title issued by the land

court and a recordation of title at the bureau of conveyances."
In re 2003 Ala Wai Blvd., 85 Hawai'i at 405, 944 P.2d at 1348.

Initial registration of property in Land Court "is not a simple matter" and "has often been compared to an action to quiet title." 11 Thompson on Real Property, § 92.10(c) (David A. Thomas ed., 3d ed. 2015); 3 Patton and Palomar on Land Titles, § 682 (3d ed. 2003). A party first files an application with the registrar. HRS § 501-22 (2006); see HRS § 501-21 (2006) (specifying who may file an application); HRS § 501-23 (2006) (listing requirements of contents of application). After an application is filed, the court enters an order referring the application to an examiner of title who searches records, investigates facts, and files a report, "concluding with a certificate of the examiner's opinion upon the title." HRS § 501-32 (2006). If the opinion of the examiner is adverse to the applicant, the applicant may elect to proceed further or withdraw the application. Id. If, in the examiner's opinion, the applicant has good title or if the applicant elects to proceed notwithstanding an adverse opinion, the registrar publishes notice of the application by order of the court in a newspaper of general circulation; the notice must include the names of all persons known to have an adverse interest in the property and the adjoining owners and occupants, so far as known. HRS § 501-41 (2006). The notice is also mailed to any

14

person named in the notice and is posted in a conspicuous place on the property. HRS § 501-42 (2006). Those claiming an interest in the property may appear and file an answer. HRS § 501-45 (2006). If no person answers within the time allowed, the court may order a default to be recorded, enter a decree confirming the title of the applicant, and order registration of the title. HRS § 501-46 (2006).

If an answer is filed, the case is set for hearing on motion of a party, HRS § 501-51 (2006), at which time a judge of the Land Court decides whether the applicant has proper title for registration. HRS § 501-71 (Supp. 2016). If the court finds proper title, the court issues a decree of confirmation and registration subject to any encumbrances or interests found. HRS § 501-71(a)-(b). Decrees of registration of absolute title bind the property and quiet title to it, and they are thus conclusive upon and against all persons.[12] HRS § 501-71(d); see also HRS § 501-73 (2006) ("The court may remove clouds on titles and may find and decree in whom the title or any interest, legal or equitable, in land is vested, whether in the applicant or in any other person."). The decree must contain certain

---

[12] Types of non-absolute title are possessory title and qualified title. HRS § 501-72 (2006).

information, including any known encumbrances. HRS § 501-74 (2006).

After entry of the court decree, the registrar sends a certified copy of the decree to the assistant registrar. HRS § 501-75 (2006); RLC Rule 55 (1989). The assistant registrar then "transcribes the decree in a book to be called the registration book, in which a leaf or leaves in consecutive order shall be devoted exclusively to each title." HRS § 501-75. "The entry made by the assistant registrar in this book in each case shall be the original certificate of title, and shall be signed by the assistant registrar and sealed with the seal of the court." HRS § 501-75; RLC Rule 55. The certified copy of the decree of registration is "filed and numbered by the assistant registrar with a reference noted on it to the place of record of the original certificate of title." HRS § 501-75.

"The certificate first registered in pursuance of a decree of registration in regard to any parcel of land" is "entitled in the registration book 'original certificate of title, entered pursuant to decree of the land court, dated at' (stating time and place of entry of decree and the number of the case)." HRS § 501-83 (2006). The certificate "shall take effect from the date of the transcription of the decree." HRS § 501-83. Decrees of registration and the entry of certificates are agreements running with the land and are binding upon the

16

applicant and his or her successors, and the property "shall be and forever remain registered land," HRS § 501-86 (Supp. 2016), unless deregistered by the owner of record. See HRS § 501-261.5 (Supp. 2016).

Owners of registered land "may convey, mortgage, lease, charge, or otherwise deal with the same as fully as if it had not been registered." HRS § 501-101 (2006). An owner of registered land who wants to convey it in fee executes a deed of conveyance, which the grantor or grantee presents to the assistant registrar.[13] HRS § 501-108(a) (Supp. 2016); see also HRS § 501-105 (Supp. 2016) (listing requirements of voluntary instruments). If the instrument contains the requisite information, then the assistant registrar shall record the deed, mortgage, or other voluntary instrument.[14] RLC Rule 58 (1989); HRS § 501-108(a). "The act of registration shall be the operative act to convey or affect the land." HRS § 501-101.

Following tender of the deed of conveyance, "in accordance with the rules and instructions of the court," the assistant registrar "shall make out in the registration book a

---

[13] Conveyance of land less than fee simple are addressed in HRS § 501-103 (2006).

[14] Instruments are "stamped with the date, hour, and minute of reception[,]" and the instruments are "regarded as registered from the date and time so noted" and are "numbered and indexed, and indorsed with a reference to the proper certificate of title." HRS § 501-107 (Supp. 2016).

new certificate of title to the grantee," note the date of transfer on the original certificate, and stamp "canceled" on the original certificate. HRS § 501-108(a); RLC Rule 59 (1989) (after recording the instrument of transfer, "[t]he assistant registrar shall thereupon, in accordance with the rules and instructions of the court, enter a new certificate in the name of the grantee"); see also HRS § 501-83 (prescribing that "[s]ubsequent certificates relating to the same land shall be in like form" as that of the certificate first registered pursuant to a decree of registration). At the "time of any transfer," if there are encumbrances or claims adverse to the title of the registered owner upon the registration book, "they shall be stated in the new certificate or certificates, except as far as they may be simultaneously released or discharged." HRS § 501-110 (2006). The "new certificate . . . shall be binding upon the registered owner and upon all persons claiming under the registered owner, in favor of every purchaser for value and in good faith."[15] HRS § 501-106(b) (2006).

Owners of registered land may also mortgage the property. HRS § 501-116 (Supp. 2016). With some exceptions for

---

[15] In "cases of registration procured by fraud the owner may pursue all the owner's remedies against the parties to the fraud, without prejudice however to the rights of any innocent holder for value of a certificate of title." HRS § 501-106(b) (2006).

land deregistered pursuant to HRS Chapter 501, part II, all instruments dealing with the mortgage must be registered and "take effect upon the title of the mortgaged property only from the time of registration." HRS § 501-116; see also HRS § 501-117 (2006) (prescribing procedure to register a mortgage). "Mortgages of registered land may be foreclosed like mortgages of unregistered land[,]" and nothing in HRS Chapter 501 "shall be construed to prevent the mortgagor or other person in interest from directly impeaching by action or otherwise, any foreclosure proceedings affecting registered land, prior to the entry of a new certificate of title." HRS § 501-118 (2006). "After a new certificate of title has been entered, no judgment recovered on the mortgage note for any balance due thereon shall operate to open the foreclosure or affect the title to registered land." HRS § 501-118.

With some exceptions,[16] HRS § 501-212 provides a statutory remedy to any person who, without negligence on the person's part, sustains loss as a result of the registration of any other person as owner of such land through fraud, "or in consequence of any error, omission, mistake, or misdescription in any certificate of title . . . in the registration book."

---

[16] The State shall not be liable for a wrongful non-judicial foreclosure or for loss caused by a breach of trust by a registered owner trustee. HRS § 501-216 (2006).

HRS § 501-212 (2006). The claim may be brought as a contract claim "for the recovery of compensation for such loss or damage or for such land or estate, or interest therein." HRS § 501-212.[17]

If the harm arises "wholly through fraud, negligence, omission, mistake, or misfeasance of the registrar, assistant registrar, or of any of the examiners of title . . . , or of any of the assistants or clerks" in the performance of their respective duties, the action shall be brought against the state director of finance, as sole defendant. HRS § 501-213 (2006). If the harm arises solely through misfeasance of some person other than the officers and assistants, or arises jointly, "then the action shall be brought against both the director and such other person as joint defendants." HRS § 501-213. If judgment is in favor of the plaintiff and if damages cannot be recovered from other defendants, then any amount due is to be paid out of the general fund. See HRS § 501-214 (2006).

Thus, in many instances the statutory framework essentially renders the State as a guarantor of the certificate of title issued by the Land Court.

---

[17] When the person who has been deprived of land or of any estate, or interest therein, from conduct described in HRS § 501-212, has a remedy to recover the land or interest, the person shall exhaust this remedy before resorting to the statutory contract claim. HRS § 501-212.

## 2. Defining "Entry of a Certificate of Title"

Omiya presented the quitclaim deed for registration to the assistant registrar on September 15, 2010, according to the stamp on the deed, and Wells Fargo filed its complaint on November 3, 2010. Omiya contends that HRS § 501-118 and Aames Funding Corp. v. Mores, 107 Hawai'i 95, 110 P.3d 1042 (2005), bar Wells Fargo from impeaching the foreclosure proceedings because Wells Fargo filed its complaint after he presented the quitclaim deed for registration. Wells Fargo argues that the statute and Aames do not bar its claims because no certificate of title was issued to Omiya.

HRS § 501-118 provides in relevant part as follows:

> In case of foreclosure by exercising the power of sale without a previous judgment, the affidavit required by chapter 667 shall be recorded with the assistant registrar. The purchaser or the purchaser's assigns at the foreclosure sale may thereupon at any time present the deed under the power of sale to the assistant registrar for recording and obtain a new certificate. Nothing in this chapter shall be construed to prevent the mortgagor or other person in interest from directly impeaching by action or otherwise, any foreclosure proceedings affecting registered land, prior to the entry of a new certificate of title.
>
> After a new certificate of title has been entered, no judgment recovered on the mortgage note for any balance due thereon shall operate to open the foreclosure or affect the title to registered land.

HRS § 501-118 (emphases added). Under this section, a mortgagor's right to directly impeach a foreclosure proceeding is "expressly limited to the period before entry of a new certificate of title." Aames, 107 Hawai'i at 101, 110 P.3d at 1048.

21

HRS § 501-118 specifies "entry of a new certificate of title" as the determinative point when foreclosure proceedings may no longer be impeached. To determine what constitutes a new certificate of title and entry thereof, we consider principles of statutory construction, the legislative history of the provision, and the structure of the statutes.

### a. Statutory Construction

"The fundamental starting point of statutory interpretation is the language of the statute itself," and "where the statutory language is unambiguous, our duty is to give effect to its plain and obvious meaning." State v. Alangcas, 134 Hawai'i 515, 525, 345 P.3d 181, 191 (2015). To effectuate a statute's plain language, its words "must 'be taken in their ordinary and familiar signification, and regard is to be had to their general and popular use.'" See State v. Guyton, 135 Hawai'i 372, 378, 351 P.3d 1138, 1144 (2015) (quoting In re Taxes of Johnson, 44 Haw. 519, 530, 356 P.2d 1028, 1034 (1960)); see also HRS § 1-14 (2009). "In conducting a plain meaning analysis, 'this court may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined.'" Guyton, 135 Hawai'i at 378, 351 P.3d at 1144 (quoting State v. Pali, 129 Hawai'i 363, 370, 300 P.3d 1022, 1029 (2013)).

22

It is also "a canon of construction that statutes that are in pari materia may be construed together." State v. Kamana'o, 118 Hawai'i 210, 218, 188 P.3d 724, 732 (2008) (quoting Black's Law Dictionary 806 (8th ed. 2004)). "Thus, '[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.'" Id. (alteration in original) (quoting Barnett v. State, 91 Hawai'i 20, 31, 979 P.2d 1046, 1057 (1999)); see also HRS § 1-16 (2009).

The plain meaning of "prior to the entry of a new certificate of title" clearly contemplates the transcription of information into some common repository, and not merely the acceptance or stamping of an existing document. See Entry, Black's Law Dictionary (10th ed. 2014) ("An item written in a record; a notation." (emphasis added)). This plain meaning reading of HRS § 501-118 is underscored by other statutes pertaining to the same subject matter in HRS Chapter 501.

Following the Land Court's decision to grant an application to register property in Land Court, the Land Court issues a decree.[18] HRS 501-71(a)-(b). A copy of that decree is

_____

[18] The required contents of a decree include information as to the names of the owner and spouse, if married, a description of the land, and a description of "the estate of the owner, and also, in such manner as to show

(continued . . .)

23

then sent to the assistant registrar.  HRS § 501-75.  The assistant registrar "transcribe[s] the decree" in the registration book "in which a leaf or leaves in consecutive order shall be devoted exclusively to each title."  Id.  "The entry made by the assistant registrar in this book in each case shall be the original certificate of title," id., and the certificate "take[s] effect from the date of the transcription[,]" HRS § 501-83.  Thus, the act of transcribing the decree into the registration book results in creation of the original certificate of title, which is retained in the registration book with all other certificates.  The original certificate in the registration book is entitled "original certificate of title, entered pursuant to decree of the land court, dated at," followed by the "time and place of entry of decree and the number of the case."  HRS § 501-83.

An owner desiring to convey in fee registered land, or any portion thereof, executes a deed of conveyance, which is then presented to the assistant registrar.  HRS § 501-108(a).  If the instrument contains the requisite information, then the

---

(. . . continued)

their relative priority, all particular estates, mortgages, easements, liens, attachments, and other encumbrances."  HRS § 501-74; cf. HRS § 501-82 (Supp. 2016) (providing that holder of certificate of title holds "free from all encumbrances except those noted on the certificate" and statutorily enumerated encumbrances).

assistant registrar records it.  RLC Rule 58; HRS § 501-108(a).

Following recording and in accordance with prescribed procedures

involving a review and certifying process, the assistant

registrar "make[s] out in the registration book a new

certificate of title to the grantee," and the original

certificate of title is stamped "canceled."[19]  HRS § 501-

108(a)(1); see RLC Rule 59 ("The assistant registrar shall

thereupon, in accordance with the rules and instructions of the

court, enter a new certificate in the name of the grantee.").

The assistant registrar also lists any encumbrances or claims

adverse to the title of the owner on the new certificate of

title, unless they can be simultaneously released or discharged.

HRS § 501-110.

Thus, provisions of HRS Chapter 501 provide the

original and new certificates of title as being within the

registration book--the decree is "transcribe[d] in the

[registration] book," which "shall be the original certificate

of title," and new certificates of title are "ma[d]e out in the

registration book."  HRS §§ 501-75, 501-108(a); see HRS § 501-

196 (2006) (disallowing, with some exceptions, erasures,

alterations, or amendments "upon the registration book after the

---

[19]    It is not clear if certificates that follow the original are also stamped "canceled."  See HRS § 501-108(a)(2).

25

entry of a certificate of title . . . thereon"). Original certificates of title are therefore created when they are transcribed in the registration book and do not exist prior to this transcription, and similarly, new certificates of title are created when they are made out in the registration book.

Additionally, HRS § 501-83 provides that certificates of title subsequent to the original certificate--i.e., new certificates--"shall be in like form" to the original certificate. HRS § 501-83. RLC Rule 52 (1989) defines "certificate" as "a certificate of title showing the owner's name, a description of the land and a summary of encumbrances affecting the land, if any." Thus, a new certificate of title has information referencing the original registration, the owner's name, a description of the property, and a summary of encumbrances.[20] None of this information is contained in a TCT number.

Further, when statutory provisions in HRS Chapter 501 refer to a certificate of title, that is precisely what is

---

[20] It appears that, as the name implies, a certificate of title must also be certified with the signature or initials of the assistant registrar. HRS § 501-75 expressly provides that an original certificate of title "shall be signed by the assistant registrar and sealed with the seal of the court," and, as stated, new certificates of title "shall be in like form" to the original certificate. HRS § 501-83. Perez, in her declaration, averred that the new certificate of title in this case had not yet been signed by an assistant registrar and that for the new certificate "to be certified, it would have to be signed by an assistant registrar" according to a staff person at the Office of the Assistant Registrar. See infra note 31 and accompanying text.

meant;[21] when provisions in HRS Chapter 501 reference the <u>number</u> of the certificate of title, that is also what is meant.[22]  If the legislature intended for the issuance of the number of the certificate of title to be the determinative point for when parties could no longer impeach foreclosure proceedings, the legislature would have so provided.  Cf. <u>Hyland v. Gonzales</u>, 139 Hawai'i 386, 391, 390 P.3d 1273, 1278 (2017) ("If the legislature

---

[21]     <u>See, e.g.,</u> HRS § 501-83.5 (2006) ("[T]he assistant registrar shall accept for filing any deed or other voluntary instruments without requiring the presentation of the outstanding duplicate certificate."); HRS § 501-84 (2006) ("Any conveyance of fee simple interest in registered land shall be recorded with the assistant registrar, who shall note the same on the certificate . . . [and] cancel all the certificates affecting the whole land . . . ."); HRS § 501-88 (2006) ("The original certificate in the registration book . . . shall be received as evidence in all the courts of the State and shall be conclusive as to all matters contained therein."); HRS § 501-108(a)(3) ("The original certificate shall be stamped 'canceled' . . . ."); HRS § 501-144 (2006) ("Every new certificate entered under this section shall contain a memorandum of the nature of the proceeding on which it is based . . . ."); HRS § 501-156 (2006) ("[A]ny new certificate entered in pursuance of partition proceedings . . . shall contain a reference to the final judgment of partition . . . .").

[22]     <u>See, e.g.,</u> HRS § 501-102(a) (2006) ("Every conveyance, lien, attachment, order, decree, instrument, or entry affecting registered land . . . shall . . . contain a reference to the number of the certificate of title . . . ."); HRS § 501-108(a) ("[N]o deed, mortgage, lease, or other voluntary instrument shall be accepted by the assistant registrar for registration unless a reference to the number of the certificate of title of the land affected by such instrument is incorporated in the body of the instrument . . . ."); HRS § 501-131 (2006) ("The assistant registrar shall note upon the original instrument creating or declaring the trust or other equitable interest a reference by number of the certificate of title to which it relates."); HRS § 501-136 (2006) ("In addition to any particulars required in such papers for recording with records of deeds, it shall also contain a reference to the number of the certificate of title of the land to be affected . . . ."); HRS § 501-151 (Supp. 2016) ("No writ of entry, action for partition, or any action affecting the title to real property . . . and no judgment, nor any appeal or other proceeding to vacate or reverse any judgment, shall have any effect upon registered land as against persons other than the parties thereto, unless a full memorandum thereof, containing also a reference to the number of the certificate of title of the land affected is filed or recorded and registered.").

intended that local boards of registration's jurisdiction would be so limited, then the legislature would have used language to indicate that delivery was required.").

Accordingly, the plain language of HRS § 501-118, statutes in pari materia, and other principles of statutory construction underscore that the issuance of a new certificate of title number is not the statutory equivalent of an entry of a new certificate of title under HRS § 501-118.[23]

### b. Legislative History

"The legislative history of a statute remains relevant 'even when the language appears clear upon perfunctory review.'" State v. Alangcas, 134 Hawai'i 515, 526, 345 P.3d 181, 192 (2015) (quoting Richardson v. City & Cty. of Honolulu, 76 Hawai'i 46, 68–69, 868 P.2d 1193, 1215–16 (1994) (Klein, J., dissenting));

---

[23] We note that, although a certificate of title is created upon transcription in the "registration book," HRS §§ 501-75, 501-108(a)(1), the statutory scheme indicates "registration" is a distinct act occurring prior to the entry of a certificate of title. In the context of newly registered land, registration occurs when the land court enters a "decree of confirmation and registration." HRS § 501-71(a). Entry of an original certificate of title occurs later, when the assistant registrar transcribes the decree into the registration book, HRS § 501-75, with the certificate taking effect upon transcription. HRS § 501-83. Subsequent registrations of conveyances and other instruments affecting registered land occur "during office hours," HRS § 501-101, and are effective from the time the instrument is received by the assistant registrar. HRS § 501-107. Thus, registration of a subsequent instrument occurs when the instrument is received by the assistant registrar, and this delivery acts to transfer the applicable interest. See HRS § 501-101 ("The act of registration shall be the operative act to convey or affect the land . . . ."). The transfer is not made unimpeachable under HRS § 501-118, however, until a new certificate of title is issued.

see State v. Entrekin, 98 Hawaiʻi 221, 227, 47 P.3d 336, 342 (2002) (using legislative history to confirm interpretation of statute). "Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute." Survivors of Medeiros v. Maui Land & Pineapple Co., 66 Haw. 290, 297, 660 P.2d 1316, 1321 (1983).

According to the Furukawa Declaration, there was a backlog of nearly four years at the Land Court in certifying new certificates of title for properties registered in Land Court. Over time, there have been legislative efforts to alleviate the backlog. As early as 1985, there was a backlog at the Land Court of which the legislature was aware. See, e.g., S.C. Rep. No. 38, in 1985 Senate Journal, at 921 ("Testimony by the Department of Land and Natural Resources and confirmation from practitioners in this area indicate that there is currently a seven month delay in processing land court documents."). The following year, the legislature appropriated funds to computerize the Land Court in an effort to reduce the backlog. See 1986 Haw. Sess. Laws Act 246, §§ 26-28 at 441-42; S.C. Rep. No. 38, in 1985 Senate Journal, at 921.

More recently, the legislature passed a pair of acts aimed to alleviate the backlog, one in 2009 and the other in 2012. The first act's stated purpose was to "ease the backlog" in Land Court by, inter alia, allowing an owner of a fee interest in registered land to transfer it to the regular system, allowing electronic recording of instruments, and transferring fee simple timeshare interests from the Land Court to the regular system. 2009 Haw. Sess. Laws Act 120, § 1 at 304. The stated purpose of the second act was also to "ease the backlog" by requiring that fee timeshare interests be recorded in the regular system rather than Land Court and "streamlining the procedure for deregistering" remaining fee timeshare interests. See 2012 Haw. Sess. Laws Act 121, § 1 at 426. This change was a result of the legislature finding that the process required to transfer fee timeshare interests to the regular system had "exceeded the capacity of the land court, particularly in light of the approximately three year backlog of land court recordings and registration." See 2012 Haw. Sess. Laws Act 121, § 1 at 425-26; see also HRS § 501-261 (Supp. 2016).

Other changes made to Land Court procedures have included eliminating the issuance of duplicates of certificates

of title to mortgagees and lessees,[24] making issuance of a new certificate discretionary upon the appointment of a new trustee of registered land,[25] eliminating the need for a duplicate owner's certificate of title,[26] eliminating the requirement that leasehold timeshare interests be registered with the Land Court,[27] and allowing money judgments recorded in the Bureau of Conveyances to encumber registered property.[28]

The act creating Land Court and enacting the precursor to HRS § 501-118 was passed in 1903. 1903 Haw. Sess. Laws Act 56. The statute read in relevant part as follows: "[N]othing contained in this Act shall be construed to prevent the mortgagor or other person in interest from directly impeaching, by bill in equity or otherwise, any foreclosure proceedings affecting registered land, prior to the entry of a new certificate of title." 1903 Haw. Sess. Laws Act 56, § 63 at 307. This provision is virtually identical to the current iteration of HRS § 501-118 and has remained unchanged in

---

[24] Stand. Comm. Rep. No. 432, in 1951 Senate Journal, at 933; see 1951 Haw. Sess. Laws Act 142.

[25] S.C. Rep. No. 38, in 1985 Senate Journal, at 921; see 1986 Haw. Sess. Laws Act 246, § 13 at 436.

[26] S.C. Rep. No. 2258, in 1988 Senate Journal, at 965; see 1988 Haw. Sess. Laws Act 346.

[27] S.C. Rep. No. 2619, in 1998 Senate Journal, at 1060; see 1998 Haw. Sess. Laws Act 219, § 1 at 753.

[28] See 2014 Haw. Sess. Laws Act 19, §§ 1-3 at 40-42.

substance from the inception of the Land Court.  Compare id., with HRS § 501-118.  Indeed, in 1998, the legislature specifically "[r]etain[ed] the original statutory language in [HRS § 501-118], which refers to the ability for the mortgagor to directly impeach any foreclosure proceeding affecting registered land, prior to the entry of a new certificate of title."  Conf. Comm. Rep. No. 75, in 1998 Senate Journal, at 774; see also Aames Funding Corp., 107 Hawai'i at 102, 110 P.3d at 1049 (noting that amendments were made to HRS § 501-118, but that the cutoff to impeach foreclosure proceedings was retained (quoting Conf. Comm. Rep. No. 75, in 1998 House Journal, at 980)).

Throughout the many legislative amendments to HRS Chapter 501, including those made for the express purpose of reducing the backlog, the legislature has consistently maintained the entry of a new certificate of title as the deadline for impeaching foreclosure proceedings.  Omiya contends that "the Land Court's practice is to hold that a new TCT is 'entered' when the new TCT number is stamped on the recorded deed."[29]  The legislature, however, has not enacted the multiple amendments throughout HRS Chapter 501 necessary to adopt this

_____

[29]     Omiya cites Gary W.B. Chang, Land Court: Demystifying an Enigma, Haw. B. J. 4 (Sept. 2017), which states that the Land Court's practice was the result of "a pragmatic decision."

32

practice.  Instead, the legislature has sought to alleviate the backlog by increasing resources, streamlining certain procedures, and reducing the need to issue certificates and duplicate certificates.

Thus, despite various statutory changes made to HRS Chapter 501 since its enactment, HRS § 501-118 has remained virtually identical, evincing the legislature's intent to maintain the entry of a new certificate as the pivotal juncture after which foreclosure proceedings may no longer be impeached. This conclusion is underscored by the legislature's response to the Land Court backlog.  The legislature enacted the amendments discussed above for the express purpose of addressing the Land Court's workload, but at no point did the legislature amend HRS § 501-118 to prohibit foreclosure proceedings from being directly impeached prior to the entry of a new certificate.[30] Any change in Land Court practice that implemented such a bar was clearly inconsistent with the legislative history and statutory provisions of HRS Chapter 501.

c.    **Structural Considerations**

As stated, the primary purpose of the Torrens Land Act, codified in HRS Chapter 501, "is to conclusively establish

---

[30]    HRS § 501-118 has not been amended since 1998.  See 1998 Haw. Sess. Laws Act 122, § 3 at 477.

title to land through the <u>issuance of a certificate of title</u>."
<u>Aames Funding Corp.</u>, 107 Hawai'i at 101, 110 P.3d at 1048
(emphasis added).  Thus, a <u>land court certificate of title</u> is
"conclusive and unimpeachable" with regard to "all matters
contained therein."  <u>In re Bishop Tr. Co.</u>, 35 Haw. 816, 825
(Haw. Terr. 1941).  The circuit court and ICA decisions,
however, make a recorded deed stamped with an assigned TCT
number the equivalent of a new certificate of title.

Preparation of a new certificate of title involves a
verification process as the document is intended to be a
conclusive, comprehensive listing of every interest in the
property.[31]  <u>See</u> <u>id.</u>  The certifying process is key to the
issuance of a new certificate of title both to maintain the
integrity of the Land Court system by ensuring the registration

---

[31]     In the article cited by Omiya, Judge Chang explains that the
current Land Court practice is to subject registered conveyances to a
"secondary review" prior to "the final act of certifying the new TCT as being
recognized by the assistant registrar."  Chang, <u>supra</u> note 29, at 13 n.18.
During this review, "the document and the content of the superseded TCT can
be studied and examined to determine whether the new transaction meets the
requirements of land court" and to verify that there are no typographical
errors in the document.  <u>Id.</u>

Judge Chang states that "TCT numbers are assigned on a random,
chronological order depending upon when a document is recorded," and a single
mistyped digit in a seven digit TCT number can result in the document
applying "to a completely different parcel of property."  <u>Id.</u> at 18 n.35.
The article also notes that complex mortgage and lending documents may
contain drafting errors that preclude issuance of a certificate of title.
<u>Id.</u> at 10 n.16.  Judge Chang indicates that a registered conveyance may be
pending secondary review if the corresponding entry in the registration book
"is not initialed by the assistant registrar, or . . . the list of
encumbrances/memorials . . . are left totally blank."  <u>Id.</u> at 13 n.18.

book is completely accurate and to avoid the potential adverse consequences that can result if the information entered on a certificate is incorrect.  Aames Funding Corp., 107 Hawai'i at 101, 110 P.3d at 1048 (explaining that the purpose of the registration "is to conclusively establish title to land through the issuance of a certificate of title").

In many circumstances, the State is statutorily liable to any non-negligent person who sustains loss or damage, or is deprived of land or of any estate or interest therein, "in consequence of any error, omission, mistake, or misdescription in any certificate of title," by Land Court personnel in the performance of their duties.[32]  HRS § 501-212.  This liability even extends to situations in which the misfeasance is wholly the result of some person other than Land Court personnel, or arises from joint misfeasance, and the judgment shall be paid by the State when amounts due by other defendants are not satisfied.  HRS § 501-213.  The State is not liable, however, when the aggrieved person is able to recover the property.  HRS § 501-212.

---

[32]    Although "[t]he State shall not be liable to pay for any loss, damage, or deprivation occasioned . . . by the improper exercise of any power of sale in a mortgage," HRS § 501-216, the effect of an entry of a certificate of title with respect to the State's role as guarantor has implications in other contexts involving registered land.

Treating a stamped deed with an assigned TCT number as a certificate of title that precludes an aggrieved person from recovering property would thus pose a significantly increased liability risk for the State.  See Legis. Reference Bureau, Two Land Recording Systems, H.R. 47-7, at 20 (1987) ("[T]he single claim of $110,000 paid in 1986 by the State, pursuant to the provisions of [HRS § 501-212] has nearly depleted the total amount of fees estimated to have been collected for the fund . . . .").  If the statutory determinative point when title becomes unimpeachable is to be made effective prior to the issuance of a certificate of title, it must be the result of legislative amendments to HRS Chapter 501, and not of a change in practice of the Land Court.

### 3. Wells Fargo's Admission

Omiya asserts that Wells Fargo admitted in the complaint that a new certificate number was issued in favor of Omiya.  The ICA, after concluding that a TCT number has the same effect as issuance of an actual certificate of title, then determined that Wells Fargo's complaint contained a judicial admission that issuance of the TCT number in this case had the effect of registering title in Omiya's name.

A judicial admission is a formal statement, either by a party or his or her attorney, in the course of a judicial proceeding that removes an admitted fact from the field of

36

controversy. Lee v. Puamana Cmty. Ass'n, 109 Hawai'i 561, 573, 128 P.3d 874, 886 (2006). "It is a voluntary concession of fact by a party or a party's attorney during judicial proceedings." Id. Omiya points to two paragraphs in the complaint that he argues contains judicial admissions. The first reads as follows:

> [Plaintiff] . . . alleges and avers, as follows: . . . .
>
> 3. That Defendant DANIEL TSUKASA OMIYA ("Omiya"), husband of Sandra Sachiko Omiya, whose address is 1314 South King Street, Suite 1052, Honolulu, 96814 also claims to the be owner of the Property by virtue of that certain Quitclaim Deed filed on September 15, 2010 as Document No. 3999421 in the Office of the Assistant Registrar of the Land Court, State of Hawaii which resulted in the issuance of Transfer Certificate of Title No. 996,234 registering title in the name of Defendant Omiya.

(Emphasis added.) The other paragraph Omiya points to states the following:

> WHEREFORE, Plaintiff prays, as follows:
>
> 1. As to Count One, the Court declare the foreclosure sale of the Property conducted by Defendant Ilikai null and void; that all parties claiming by, through or under said foreclosure sale, including but not limited to Defendant Omiya, have no legal interest in the Property; that Plaintiff be declared the legal owner of the Property; and the Assistant Registrar of the Land Court, State of Hawaii, be directed to take such action as necessary to restore legal title to Plaintiff, including but not limited to, cancellation of TCT No. 996,234 issued to Defendant Omiya.

(Emphasis added.) Omiya specifically references the underscored language in both paragraphs as constituting judicial admissions.

HRS § 501-118 allows impeachment of non-judicial foreclosure proceedings of registered land "prior to the entry of a new certificate of title." HRS § 501-118. The first

purported admission states that the filed quitclaim deed "resulted in the issuance of Transfer Certificate of Title No. 996,234 registering title in the name of Defendant Omiya." The statement does not admit that a new certificate of title was issued and then entered; rather, it admits only that a new certificate number was issued.[33] The second contended admission requests that the circuit court cancel the TCT number that was issued. It does not request that a certificate of title be cancelled. Neither of Wells Fargo's statements in the complaint admits that a new certificate of title was issued.

### 4. Erroneous Grant of Summary Judgment

In this case, Omiya presented a quitclaim deed to the assistant registrar, who stamped it with the date and time. That stamp registered the quitclaim deed, making it effective as a conveyance. See HRS §§ 501-101, 501-107 (Supp. 2016); supra note 23. For the reasons discussed, registering a quitclaim deed is not equivalent to the creation or entry of a new certificate of title. As Wells Fargo argued, the evidence does not show that a new certificate of title was entered; had one been created, a certified and sealed copy of the certificate would have been admissible as evidence. See HRS § 501-88 (2006)

---

[33] Judge Ginoza's dissent aptly observed that the complaint was not dispositive: "Rather, the pertinent question under HRS § 501-118 is whether there has been 'entry of a new certificate of title.'"

(certified and sealed copies of certificates "shall be received as evidence in all the courts of the State"); cf. Aames Funding Corp. v. Mores, 107 Hawai'i 95, 97, 110 P.3d 1042, 1044 (2005) ("Trial began with both parties stipulating to the authenticity of . . . a certified copy of TCT No. 587,098," which was accepted into evidence).

In addition, the stamp on the quitclaim deed in this case reads "Issuance of Cert(s) 996,234." Based on this stamp, Omiya argued that a new certificate had been issued. But, as explained, assignment of a new TCT number does not demonstrate that a new certificate of title has been duly prepared and entered. Thus, the record in this case does not show that "a new certificate of title has been entered," which is required to invoke the statutory protection provided by HRS § 501-118.[34]

In affirming the circuit court's grant of summary judgment, the ICA adopted the circuit court's interpretation that the assignment of a TCT number has the same effect as a new certificate of title. As explained, this conclusion is contradicted by the plain language of HRS § 501-118, statutes and rules that are in pari materia, the legislative history of HRS Chapter 501, and the statutory scheme underlying the Land

---

[34] Wells Fargo argued that Omiya did not present a certificate of title meeting the definition of RLC Rule 52. Omiya does not contend that he presented such a document.

Court system.  Accordingly, equating a TCT number to issuance and entry of a new certificate of title was error, and the grant of summary judgment in favor of Omiya on this ground was improper.

### B.  Adequacy of Purchase Price

Wells Fargo also contends that the circuit court erroneously granted summary judgment in favor of Omiya because there was a genuine issue of material fact as to whether the AOAO used reasonable means to obtain the best price for the Property.  Omiya counters that Wells Fargo's challenge is barred by HRS § 501-118 and that, even if it were not, Wells Fargo did not submit admissible evidence of the value of the Property.  Because we have concluded that Wells Fargo's complaint is not barred by HRS § 501-118, its contention as to the adequacy of the price for the Property may be considered.

Mortgagees exercising their right to non-judicial foreclosure under a power of sale must do so "in a manner that is fair, reasonably diligent, and in good faith, and to demonstrate that an adequate price was procured for the property."  Kondaur Capital Corp. v. Matsuyoshi, 136 Hawai'i 227, 240, 361 P.3d 454, 467 (2015) (citing Ulrich v. Sec. Inv. Co., 35 Haw. 158, 168 (Haw. Terr. 1939)); see also id. at 239-40, 361 P.3d at 466-67 (holding that duties under Ulrich apply to non-

40

judicial foreclosures of real property).[35]  Although "the mortgagee's duty to seek the best price under the circumstances does not require the mortgagee to obtain the fair market value of the property[,]" "the mortgagee nonetheless has a duty to use fair and reasonable means to conduct the foreclosure sale in a manner that is conducive to obtaining the best price under the circumstances."  Hungate v. Law Office of David B. Rosen, 139 Hawai'i 394, 408-09, 391 P.3d 1, 15-16 (2017).

"[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Kondaur, 136 Hawai'i at 240, 361 P.3d at 467 (quoting Price v. AIG Haw. Ins. Co., 107 Hawai'i 106, 110, 111 P.3d 1, 5 (2005)).  All evidence and inferences therefrom are to be viewed in the light most favorable to the non-moving party.  Id.

---

[35]  The foreclosure by the AOAO was conducted under power of sale pursuant to, inter alia, HRS §§ 667-5 to 667-10.  The AOAO was therefore subject to the requirements of Ulrich and Kondaur.  See Hungate v. Law Office of David B. Rosen, 139 Hawai'i 394, 408, 391 P.3d 1, 15 (2017); see also Kondaur, 136 Hawai'i at 230 n.3, 361 P.3d at 457 n.3 ("HRS §§ 667-5 to 667-10 governed the process of foreclosure by power of sale (i.e., non-judicial foreclosure) and were within Part I of HRS Chapter 667.  HRS §§ 667-5 to 667-8 were repealed by the legislature in 2012." (citing 2012 Haw. Sess. Laws Act 182, § 50 at 684)).

Before this court, Wells Fargo cites the 2010 tax-assessed value that was included with the quitclaim deed submitted by Omiya to support its contention that summary judgment was improperly granted. Omiya contends that we should not consider the 2010 tax-assessed value because Wells Fargo did not make that argument or specifically point to that evidence before the circuit court, therefore waiving use of that evidence.

Omiya cites in support of its argument Munoz v. Yuen, which noted that "in reviewing a summary judgment, this court will not examine evidentiary documents, such as depositions and admissions, not specifically called to the attention of the trial court, even though they may be on file in the case." 66 Haw. 603, 606, 670 P.2d 825, 827 (1983). In Munoz, none of the documents filed in support of and in opposition to the motion for summary judgment cited the depositions that the appellant sought to rely upon on appeal to establish a genuine issue of material fact. Id. Nor were the depositions referenced during the hearing. Id. In contrast, Omiya included the quitclaim deed and the 2010 tax-assessed value as an exhibit to his summary judgment motion. Accordingly, the 2010 tax-assessed

value would have been within the circuit court's attention during the summary judgment proceedings.[36]

The 2010 tax-assessed value as of June 22, 2010, before the August 18, 2010 foreclosure sale, was $281,100. Omiya paid $15,000 at the foreclosure sale. The difference between the assessed value and the purchase price, viewed in the light most favorable to Wells Fargo as the non-moving party, creates a genuine issue of material fact as to whether the AOAO used reasonable means to obtain the best price for the Property. Therefore, the grant of summary judgment as to the adequacy of the bid price for the Property was erroneous.[37]

---

[36] Additionally, Omiya argues that the internet printout showing a 2012 tax assessment that Wells Fargo submitted with the Perez Declaration was inadmissible hearsay and not relevant, as the tax-assessed value was for a time period after the foreclosure took place. In light of our conclusion with regard to the evidence of the 2010 tax-assessed value of the Property before the circuit court, this argument is not addressed.

[37] Omiya raises other arguments that are unavailing. Omiya contends that because Wells Fargo stipulated to receiving foreclosure-related notice, Wells Fargo "waiv[ed] any challenge to the underlying foreclosure notice, process, or conduct that resulted in the foreclosure sale price." Aside from the fact that Omiya raises this argument for the first time in his response to the application for a writ of certiorari, it is without merit. Hungate, which Omiya relies upon for its contention, does not indicate that stipulating to notice precludes any challenge to a foreclosure sale. After discussing the common-law duty addressed in Kondaur and Ulrich, this court held that what had to be proven was "that the sale was fairly conducted and resulted in an adequate price under the circumstances." Hungate, 139 Hawaiʻi at 408-09, 391 P.3d at 15-16 (citing Kondaur, 136 Hawaiʻi at 240-42, 361 P.3d at 467-69).

Omiya also argues for the first time before this court that "a defective non-judicial foreclosure process results in merely voidable title, not void," and, accordingly, "Wells Fargo's remedy is limited to monetary damages against the alleged wrongful foreclosing party, [the AOAO,] not the foreclosure buyer," because "an innocent purchaser like [himself] is protected." (Citing Mount v. Apao, 139 Hawaiʻi 167, 169, 384 P.3d 1268, 1270

(continued . . .)

## IV. CONCLUSION

For the foregoing reasons, we vacate the ICA's August 29, 2017 Judgment on Appeal; the circuit court's Order Granting Defendant Daniel Tsukasa Omiya's Motion for Summary Judgment or, Alternatively, to Dismiss for Failure to Comply with Discovery Order, Filed December 21, 2011, filed March 29, 2012; the Order Granting Defendant Daniel Tsukasa Omiya's Motion for Entry of Rule 54(b) Final Judgment, Filed April 18, 2012, filed June 6, 2012; and the Amended Partial Final Judgment In Favor of Defendant Daniel Tsukasa Omiya, filed February 5, 2013.  The case is remanded to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Gary Y. Okuda<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Charles A. Price<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

(. . . continued)

(2016); <u>Santiago v. Tanaka</u>, 137 Hawai'i 137, 158, 366 P.3d 612, 633 (2016).)  In his motion for summary judgment, Omiya argued only that he was statutorily protected because a certificate of title had issued, and this was the sole basis of the circuit court's ruling.  The circuit court did not consider whether an innocent purchaser of property registered in the Land Court system is protected when a certificate of title has not issued, nor did the court make any finding that Omiya was in fact an innocent purchaser.  Accordingly, we do not address these issues.