**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000515**
**29-JUN-2021**
**07:54 AM**
**Dkt. 60 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
SAMUEL K. KAEO, Defendant-Appellant


NO. CAAP-16-0000515


APPEAL FROM THE DISTRICT COURT OF THE SECOND CIRCUIT
WAILUKU DIVISION
(CASE NO. 2DCW-15-0002103)


JUNE 29, 2021


GINOZA, CHIEF JUDGE AND LEONARD, J.
(WITH NAKASONE, J., DISSENTING)


OPINION OF THE COURT BY GINOZA, CHIEF JUDGE

Defendant-Appellant Samuel K. Kaeo (**Kaeo**) appeals from the "Trial Decision and Order" filed on June 15, 2016, and the "Judgement and Notice of Entry of Judgment" (**Judgment**) filed on June 29, 2016, by the District Court of the Second Circuit (**District Court**).[1]  On July 31, 2015, Plaintiff-Appellee State of Hawai'i (**State**) charged Kaeo by Complaint with: refusal to provide ingress or egress in violation of Hawaii Revised Statutes

---

[1] The Honorable Blaine J. Kobayashi presided.

(**HRS**) § 852-1 (**count 1**); failure to disperse in violation of HRS § 711-1102 (**count 2**); and disorderly conduct in violation of HRS § 711-1101(1)(d) (**count 3**).[2] The State ultimately proceeded only on count 3.

On June 29, 2016, after a bench trial for count 3, the District Court convicted Kaeo of disorderly conduct, in violation of HRS § 711-1101(1)(d) (2014)[3] and sentenced Kaeo to pay a fine of $200 and a fee of $30.

On appeal, Kaeo contends that his conviction should be reversed because: (1) he engaged in constitutionally protected conduct; and (2) findings of fact (**FOFs**) 4 and 23, and conclusions of law (**COLs**) 1, 2, and 3 in the Trial Decision and Order are erroneous.

We conclude that Kaeo's conduct in this case was not constitutionally protected conduct, and that the District Court did not err in its findings of fact and conclusions of law that Kaeo challenges on appeal. We therefore affirm the Judgment by the District Court.

## I. Background[4]

On July 30, 2015, a convoy of vehicles was scheduled to transport large components from the Central Maui Baseyard

---

[2] On September 1, 2015, after Kaeo demanded a jury trial, the case was committed to the Circuit Court of the Second Circuit (**Circuit Court**). On March 24, 2016, the Circuit Court entered an Order of Remand for count 3 after counts 1 and 2 were dismissed.

[3] HRS § 711-1101(1)(d) provides:

> **§711-1101 Disorderly conduct.** (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:
>
> . . .
>
> (d) Creates a hazardous or physically offensive condition by any act which is not performed under any authorized license or permit[.]

[4] "Findings of fact ... that are not challenged on appeal are binding on the appellate court." Okada Trucking Co. v. Bd. of Water Supply, 97 Hawaiʻi 450, 458, 40 P.3d 73, 81 (2002); Bremer v. Weeks, 104 Hawaiʻi 43, 63, 85 P.3d 150, 170 (2004). The District Court made numerous findings in its Trial Decision and Order which are not challenged on appeal.

(**Baseyard**) to the Daniel K. Inouye Solar Telescope (**DKIST**) construction site at the summit of Haleakalā on Maui. The convoy was scheduled to leave at 10 p.m. through what was called the MECO gate.

Joseph McMullen (**McMullen**), a project manager at DKIST testified that the Baseyard is an outdoor storage facility just off of Mokulele highway used by DKIST to hold large components. McMullen's duties included managing the day-to-day construction of the DKIST and delivery of the materials for the telescope's construction. According to McMullen, at around 7 p.m. on the day in issue, Kaeo arrived at the Baseyard, spoke with McMullen, asked McMullen "is this the place where the transport was going to happen?", and after being told it was, Kaeo told McMullen "you better get ready" and that they "were in for the night." McMullen testified that initially there were about ten protesters, but the number continued to grow. At around 8:30 p.m., the Maui Police Department (**MPD**) set up lights across the median. McMullen testified that by 10:00 p.m., over a hundred protesters were outside the Baseyard, holding signs and walking around the crosswalk located outside the gate. At around 9:30 p.m. and 10:00 p.m., the convoy attempted to exit the Baseyard through the MECO gate as scheduled. According to McMullen, after the gates were opened, the trucks made a turn and the nose of a truck was pulled out just beyond the gate but was unable to go any farther as the protesters approached the trucks and the trucks had to stop. McMullen testified the protesters were just a few feet from the trucks, with the truck engines still running. McMullen also testified that the transport convoy consisted of four vehicles, three trucks, and several mechanics trucks, and he was in one of the vehicles.[5] Further, McMullen testified that approximately twenty people, including the truck drivers, were

_____

[5] McMullen testified about the load of telescope components on one of the three trucks, which was approximately 18-19 feet wide, 12 feet high, 30 feet long, and weighed almost 25 tons.

involved with transporting the materials to the construction site.

MPD received a call for assistance and Lieutenant Wade Maeda (**Lt. Maeda**) was dispatched to the Baseyard at 10:05 p.m. Lt. Maeda testified that when he first arrived at the Baseyard, the road and sidewalk outside the MECO gate were completely covered with people. Lt. Maeda also testified he informed one of the protesters that there were specific guidelines for peaceful protest and that the protesters were currently breaking the law. Lt. Maeda told several protesters to disperse. At around 10:15 p.m., Lt. Maeda activated the Specialized Emergency Enforcement Detail (**SPEED**) team because the protesters did not disperse and the convoy could not leave.

Lt. Maeda further testified that lines of five or six people connected their hands through PVC pipes and used duct tape to secure the PVC pipes to their arms so the pipes could not be slipped off. The first line of people laid themselves down approximately twenty feet from the Baseyard gate, preventing the convoy from moving forward. Lt. Maeda testified that at this point the truck engines were still running.

MPD Captain Clyde Holokai (**Captain Holokai**), commander of the SPEED team, testified that Kaeo was part of the first line of people connected with PVC pipes and that Kaeo had both arms connected to another protester. Captain Holokai approached the line of protesters on the ground, asked if they wanted to do this and warned they would be arrested. The protesters did not respond and remained on the ground. Captain Holokai ordered his sergeant and the dismantling team to start removing the PVC pipes.

Sergeant Russell Kapalehua (**Sgt. Kapalehua**) testified that the protesters lying on the ground connected with PVC pipes would not stand up on their own and that it would have taken a lot of people to carry the protesters off the road. Sgt. Kapalehua also testified that it would have been hazardous to attempt to remove the protesters while they were connected.

According to Sgt. Kapalehua, the SPEED team moved slowly to cut the PVC pipe with a hacksaw to ensure no one was injured. Sgt. Kapalehua testified that he could almost feel the heat of the engine from the trucks while he worked to get Kaeo detached. At around 12:45 a.m., the SPEED team finished separating the chained protesters and the convoy left. MPD arrested the protesters who had been chained together, including Kaeo.

## II. Discussion

### A. Kaeo's Conduct Was Not Constitutionally Protected

Kaeo contends that his conviction must be reversed because his actions in this case were constitutionally protected conduct and speech under the First and Fourteenth Amendments of the United States Constitution and article I, § 4 of the Hawaiʻi Constitution.[6]

"Questions of constitutional law are reviewed de novo under the right/wrong standard." State v. Miranda, 147 Hawaiʻi 171, 179, 465 P.3d 618, 626 (2020) (citing State v. Ui, 142 Hawaiʻi 287, 292, 418 P.3d 628, 633 (2018)).

The First Amendment to the U.S. Constitution and article I, § 4 of the Hawaiʻi Constitution prohibit the enactment of any law that abridges freedom of speech or the right peaceably to assemble.[7] However, these rights are not without limits.

---

[6] In his opening brief, Kaeo briefly references article I, § 5 of the Hawaiʻi Constitution but provides no argument with respect to this provision, which states:

> No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

Haw. Const. art. I, § 5. Because Kaeo fails to provide any argument regarding article I, §5, this issue is waived. See Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7) ("Points not argued may be deemed waived.").

[7] The U.S. Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

(continued...)

5

In <u>Cox v. State of La.</u>, 379 U.S. 536, 554-55 (1965), the U.S. Supreme Court explained that:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time.  The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.  <u>The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order</u>.  A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.  One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest.  Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly.  Governmental authorities have the duty and responsibility to keep their streets open and available for movement.  <u>A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations</u>.

(citations omitted) (emphases added).

The U.S. Supreme Court then stated: "We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." <u>Id.</u> at 555.  The Supreme Court then reaffirmed that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language,

---

[7](...continued)
U.S. Const. amend. I.  The First Amendment is applicable to the States through the Fourteenth Amendment.  <u>Virginia v. Black</u>, 538 U.S. 343, 358 (2003).

The Hawaiʻi Constitution provides:

> No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

Haw. Const. art. I, § 4.

either spoken, written, or printed." Id. (quoting Gilboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)).[8]

Notwithstanding Kaeo's argument that he intended to express his opposition to the DKIST construction in a peaceful and non-violent manner, he protested by physical conduct, chaining himself to others and blocking the transport convoy from having access to the highway from the Baseyard. See State v. Jim, 105 Hawaiʻi 319, 334, 97 P.3d 395, 410 (App. 2004) (relying on case law citing Cox and holding that the defendant's protest, which physically obstructed county water supply workers from doing their work on Hawaiian Home Lands property, was conduct outside the scope of any free speech right under the First Amendment of the U.S. Constitution and article I, § 4 of the Hawaiʻi Constitution); State v. Guzman, 89 Hawaiʻi 27, 36, 968 P.2d 194, 203 (App. 1998) (rejecting defendants' argument that a statute, which prohibited obstruction of ingress or egress from any public or private place, was unconstitutional for chilling free expression where defendants picketed at the entrance to a hospital due to a labor dispute and impeded traffic). Here, Kaeo's act of lying on the ground connected with PVC pipes to other individuals to prevent the convoy from exiting the Baseyard

---

[8] Kaeo argues that Cox is distinguishable, where the U.S. Supreme Court reversed the conviction of the defendant. However, with regard to the pertinent part of Cox, related to the defendant's conviction for Obstructing Public Passages, the conviction was not reversed because the Louisiana statute was constitutionally infirm, but rather because the U.S. Supreme Court determined that public officials in Baton Rouge were allowed unbridled discretion to determine which gatherings would be allowed and thus enabled such officials to determine which expressions would be permitted and which would not. Id. at 557. The U.S. Supreme Court thus concluded:

> [H]ere it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed.

Id. at 558. Kaeo raises no argument in this case that Hawaiʻi's Disorderly Conduct statute, HRS § 711-1101, has been applied in a discriminatory manner or with unfettered discretion.

onto the adjacent highway constituted expression mixed with conduct which was outside the scope of First Amendment and article I, § 4 freedom of speech and freedom to assemble protection.

Alternatively, Kaeo argues that HRS § 711-1101(1)(d) must be construed to include the federal and state constitutional right of free speech and assembly as an "authorized license or permit." However, Kaeo does not provide any legal authority to support his contention and does not argue that the statute is unconstitutionally vague or overbroad. Regardless, as discussed above, his actions did not fall within the scope of federal and state constitutional protections of free speech and peaceful assembly. Therefore, we disregard this argument.

**B. The District Court Did Not Err in FOF 4 and FOF 23**

Kaeo contends the District Court's FOF 4 and FOF 23 are clearly erroneous.

### 1. FOF 4

The District Court's FOF 4 states, "McMullen demonstrated, using State's Exhibits 7, 9, and 12, that there was only one practical exit from the Central Maui Baseyard to Mokulele Highway through which the transport trucks could leave." Kaeo contends FOF 4 is clearly erroneous because McMullen, as the project manager of DKIST, "was not competent to testify as to any authorized ingress and egress at the [Baseyard] because no foundation was laid as to his personal knowledge."

"Findings of fact 'are subject to the clearly erroneous standard of review. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with a definite and firm conviction that a mistake has been committed.'" State v. Enos, 147 Hawaiʻi 150, 158-59, 465 P.3d 597, 605-06 (2020) (quoting State v. Rapozo, 123 Hawaiʻi 329, 336, 235 P.3d 325, 332 (2010)).

Kaeo raised his objection to McMullen's testimony as follows:

> [THE STATE:] Okay. And why did you choose this area to
> exit, um, with the equipment pieces?

[MCMULLEN:] That's the -- we were given permission to do that and that's the only gate that really is practical for the size trucks that we have to egress from the baseyard.

[THE STATE:] You say at the tame [sic] there was a gate that blocked the entrance to the baseyard itself?

[DEFENSE COUNSEL:] Objection, your Honor, lack of competency. Apparently he's not the proprietor of this area and I object for grounds of not competent.

THE COURT: What was your question again, Mr. Segal?

[THE STATE:] At the time on July 30th, was -- was there a gate that blocked entrance to the area?

[MCMULLEN:] Yeah --

[DEFENSE COUNSEL:] Your Honor, again, I really want to object. He is simply a project manager of the telescope. There's no relevancy as to his personal contact and knowledge about the baseyard.

[THE STATE:] He established, Judge, he was there on July 30th.

THE COURT: Your objection is noted and overruled.

Hawaii Rules of Evidence (**HRE**) Rule 602 states in relevant part, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." Furthermore, "[a] witness must testify based on personal knowledge, which by definition means the witness perceived an event and has a present recollection of that perception." State v. Wakamoto, 143 Hawaiʻi 443, 452, 431 P.3d 816, 825 (2018) (citing Commentary to HRE Rule 602).

Prior to Kaeo's objection, McMullen testified that he worked on the DKIST project for about four-and-a-half years and that as the project manager, McMullen managed the day-to-day construction efforts and was responsible for, *inter alia*, the delivery of the full science scope at the observatory. McMullen testified that he had been to the Baseyard a few times and became familiar with the layout of the Baseyard as part of his duties. McMullen also provided details of the components, explained the plans for transporting the components and testified that he was

in Maui on July 30, 2015, in particular for the transport of the components.

McMullen's testimony regarding the authorized egress of the components through the MECO gate was based on his familiarity with the Baseyard and his personal knowledge of the plan for the convoy on July 30, 2015. Thus, there was sufficient foundation for McMullen's testimony that the MECO gate was the only practical exit for the size of the trucks and the District Court did not err in allowing McMullen's testimony regarding the egress of the convoy. Accordingly, the District Court's FOF 4 is not erroneous.

### 2. FOF 23

The District Court's FOF 23 states, "[a]s the custodian of records for []DOT, [Irvin] Pigao testified that on July 30, 2015, []DOT did not issue any permits to block the multi-use pathway or to block the ingress and egress onto Mokulele Highway in the area of the Central Maui Baseyard." Kaeo contends that FOF 23 is clearly erroneous because the District Court erred in not admitting into evidence Defense Exhibit L, which consisted of permits issued by the State of Hawai'i Department of Transportation (**DOT**) to DKIST and its agents for the transport of oversized trucks during June and July 2015.

Kaeo sought to introduce Defense Exhibit L to show DOT had not issued permits to DKIST or its agents to transport the materials on July 30, 2015. Kaeo also alleges Defense Exhibit L contradicts McMullen's testimony that the MECO gate was the only practical exit from the Baseyard. The District Court refused to admit this evidence after the State objected based on relevance.

When there can only be one correct answer as to admissibility of evidence, or when reviewing questions of relevance under HRE Rules 401 and 402, the appellate court applies the right/wrong standard of review. State v. Acacio, 140 Hawai'i 92, 98, 398 P.3d 681, 687 (2017) (citation omitted). HRE Rule 401 provides the definition for relevant evidence as "evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 402 provides, in pertinent part that "[e]vidence which is not relevant is not admissible."

Kaeo fails to explain how a permit or lack thereof for the convoy to transport the materials to Haleakalā is relevant to FOF 23, which found that DOT did not issue permits to block the crosswalk or the ingress and egress onto Mokulele Highway in the area of the Baseyard. Kaeo also fails to explain how Defense Exhibit L contradicts McMullen's testimony that the MECO gate was the only *practical* exit from the Baseyard. Thus, the District Court properly concluded that the evidence of whether DKIST or its agents had a permit for the convoy on July 30, 2015, was irrelevant to the determination of the charge against Kaeo. See HRS § 711-1101(1)(d). Accordingly, the District Court's FOF 23 is not erroneous.

**C. The District Court Did Not Err in COL 1, COL 2, or COL 3**

Kaeo contends that the District Court's COL 1, COL 2, and COL 3 are wrong.

### 1. COL 1

In COL 1, the District Court concluded that "[t]he testimony of the State's witnesses were more credible than that of the Defendant and the Defendant's witnesses." Kaeo contends that the District Court's COL 1 is erroneous as a matter of law because it is arbitrary and against the weight of the evidence.

Kaeo does not provide any authority in support of his contention. Nevertheless, "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." State v. Jenkins, 93 Hawaiʻi 87, 101, 997 P.2d 13, 27 (2000) (citations and brackets omitted). The Hawaiʻi Supreme Court has also stated that in a bench trial,

> it is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of facts; the judge may accept or reject any witness's testimony in whole or in part. State v. Eastman, 81 Hawaiʻi 131, 139, 913 P.2d 57, 65 (1996). It is not the role of the appellate court to weigh credibility or resolve conflicting evidence. Id.

State v. Monteil, 134 Hawaiʻi 361, 368, 341 P.3d 567, 574 (2014) (internal quotation marks, brackets, and citation omitted).

Kaeo also argues that the District Court should have specified which part or parts of the testimony it found was not credible. However, "a court is not required to make express findings regarding credibility and weight." State v. Rodrigues, 128 Hawaiʻi 200, 210, 286 P.3d 809, 819 (2012) (citing State v. Patterson, 58 Haw. 462, 468, 571 P.2d 745, 749 (1977)). Thus, the District Court did not err in finding the State's witnesses more credible.

## 2. COL 2

COL 2 states that "[t]he State has proven, beyond a reasonable doubt, each and every element of the charge of Disorderly Conduct as set forth in the complaint filed July 31, 2015." Kaeo argues that COL 2 is erroneous because his conduct was directed toward a private entity, his conduct did not create a hazardous or physically offensive condition, and even if the evidence is sufficient to sustain his conviction, the evidence is insufficient to sustain the offense as a petty misdemeanor.

Kaeo challenges the sufficiency of the evidence, which we review as follows:

> Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Kalaola, 124 Hawaiʻi 43, 49, 237 P.3d 1109, 1115 (2010) (citations and brackets omitted). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation omitted).

As previously stated, HRS § 711-1101(1)(d) provides:

> **§711-1101 Disorderly conduct.** (1) A person commits the offense of disorderly conduct if, <u>with intent to cause physical inconvenience or alarm by **a member or members of the public**, or recklessly creating a risk thereof</u>, the person:

12

. . .

> (d) Creates a hazardous or physically offensive condition by any act which is not performed under any authorized license or permit[.]

(emphases added).

We first address whether the approximately twenty individuals involved in the convoy in this case constitute a "member or members of the public" under HRS § 711-1101(1)(d). "Statutory interpretation is a question of law reviewable *de novo*." State v. Castillon, 144 Hawaiʻi 406, 411, 443 P.3d 98, 103 (2019) (citation omitted).

As set forth in HRS § 711-1100 (2014), "[p]ublic" means "affecting or likely to affect a substantial number of persons." Further, "[p]ublic place" means:

> a place to which the public or a substantial group of persons has access and includes highways, transportation facilities, schools, places of amusement or business, parks, playgrounds, prisons, and hallways, lobbies, and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence.

(emphasis added).

The commentary to HRS § 711-1101 carves out an exception for police officers and provides in pertinent part:

> A person may not be arrested for disorderly conduct as a result of activity which annoys only the police, for example. Police officers are trained and employed to bear the burden of hazardous situations, and it is not infrequent that private citizens have arguments with them. Short of conduct which causes "physical inconvenience or alarm to a member or members of the public" arguments with the police are merely hazards of the trade, which do not warrant criminal penalties.

(emphases added) (footnote omitted).

The approximately twenty individuals involved with the convoy in this case were not police officers. Kaeo argues his conduct "was directed toward a small, private entity – the DKIST – and did not cause any inconvenience or alarm to any member or members of the public[.]" However, neither the commentary to HRS § 711-1101 nor the definition of "public" under HRS § 711-1100 preclude the approximately twenty individuals involved in the

13

convoy, whether they were employees of DKIST or otherwise,[9] from being members of the public for purposes of HRS § 711-1101(1).

In State v. Spencer, No. 29176, 2009 WL 1888943, at *1 (App. July 2, 2009) (SDO), the defendant was convicted of disorderly conduct, but argued on appeal that the State failed to show that he intended to cause physical inconvenience or alarm by a member or members of the public. In that case, the defendant yelled at the complaining witness, challenged him to a fight, attempted to strike him, and followed him into a building in which the defendant did not reside in order to confront him. Id. This court concluded that the defendant's conduct recklessly caused alarm and rejected the defendant's argument that there were no members of the public present. Id. We explained:

> There was evidence that there were a "bunch of people" standing in front of the building, about twenty people standing in the lobby of the building, and five room assistants inside the lobby who witnessed the incident.
>
> Spencer's argument that the incident took place in a private building rather than a public place and that what occurred was private conduct between two people in a private building is also without merit. Spencer's conduct was committed in a public place as defined in HRS § 711-1100.

Id. We thus affirmed the defendant's conviction.

Further, we conclude that State v. Leung, 79 Hawai‘i 538, 904 P.2d 552 (App. 1995), is distinguishable. In Leung, this court held there was insufficient evidence of disorderly conduct under HRS § 711-1101(1)(b)[10] where the defendant allegedly made unreasonable noise in a theater lobby while detained by four police officers and the theater manager. Id. at 544, 904 P.2d at 558. The theater manager had already detained the defendant and his three companions when the police arrived, with the manager explaining that he had heard a loud popping noise like fire crackers or something similar to a gun shot and that the defendant and his friends were possibly the cause of the

---

[9] It is unclear from the record whether the individuals involved with the convoy were employees of DKIST.

[10] Subsection (b) of HRS § 711-1101(1) provides: "(b) Makes unreasonable noise[.]"

noise.  Id. at 540, 904 P.2d at 554.  After the police arrived, the defendant cursed at the theater manager and began to yell and shout obscenities at the manager and police.  Id.  During the incident, there were people leaving who had been watching a movie and people outside gathering, with a police officer estimating a hundred people outside and at least a hundred people inside.  Id. at 541, 904 P.2d at 555.  This court noted that theater patrons waiting for or exiting a movie, who simply stopped or slowed to satisfy their curiosity about the defendant's encounter with police cannot be said to be physically inconvenienced or alarmed. Id. at 544, 904 P.2d at 558.  Further, we noted "[t]here is no evidence that Defendant caused physical inconvenience to any member of the public or that the public was alarmed because at the time he allegedly made 'unreasonable noise,' he was under the control of the four police officers **and the theater manager**." Id. (emphases added).  Further, we explained that "[a]ssuming there was some inconvenience or alarm, there was clearly 'no physical inconvenience or alarm' to any members of the public[.]" Id.

In Leung, therefore, this court did not consider or analyze the theater manager as a member of the public because the manager had been the one to detain the defendant.  Further, the theater manager did not testify, id. at 542, 904 P.2d at 556, and thus there was no evidence from the theater manager whether the manager was physically inconvenienced or alarmed by the defendant.

Similarly, we conclude that State v. Moser, 107 Hawaiʻi 159, 111 P.3d 54 (App. 2005), is distinguishable from the instant case.  In Moser, we held there was insufficient evidence to support a conviction for disorderly conduct based on unreasonable noise in a public library, under HRS § 711-1101(1)(b).  In Moser, the defendant was soft-spoken when she first approached the circulation desk and a library employee to apply for a library card.  Id. at 161, 111 P.3d at 56.  However, the defendant became upset and began speaking loudly when the employee requested to

15

clarify the defendant's middle initial.  Id.  The library manager was in a back room when he heard someone raise their voice, so he went out to investigate.  Id. at 162, 111 P.3d at 57.  After initially observing the defendant, the manager approached her, told her that her behavior was not appropriate, identified himself, and said if she did not lower her voice she would be asked to leave.  Id. at 162-63, 111 P.3d at 57-58.  The defendant did not lower her voice, the manager asked her to leave but she would not leave, so the manager called the police.  Id. at 163, 111 P.3d at 58.

In reversing the conviction in Moser, we noted that the defendant's behavior was "considerably tamer" than in Leung and in other disorderly conduct cases based on unreasonable noise that had been reversed on appeal.  Id. at 175, 111 P.3d at 70. We also noted there was no evidence the defendant addressed anyone other than the library employee and the manager, or that the defendant intended to physically inconvenience or alarm any member of the public by speaking loudly.  Id.  Given the evidence, we noted "it is unclear whether any other patron was in the library that day and, if so, whether it was the raising of [the defendant's] voice or the dialogue between [the defendant] and [the library manager] that attracted the patron's attention." Id. at 175-76, 111 P.3d at 70-71.

Although Moser does not analyze the effect of the defendant's conduct on the library employee or the library manager, there is also no analysis or holding that these individuals could not be "a member or members of the public" under HRS § 711-1101(1).  The evidence previously recited in Moser reflects that neither of these individuals was physically inconvenienced or alarmed by the defendant's conduct.  The library employee testified the defendant's voice was not the loudest she had ever heard in the library and her testimony did not reflect any alarm or physical inconvenience to her by the defendant's conduct.  Id. at 161-62, 111 P.3d at 56-57. Similarly, the library manager's testimony did not reflect any

alarm or physical inconvenience to him by the defendant's conduct.  Id. at 162-63, 111 P.3d at 57-58.  The manager's testimony included that, after hearing someone raise their voice he "went out to investigate the situation[,]" he thought it was "kind of interesting that [the defendant] would be so upset about something like her middle initial," he initially just "sat there and witnessed" the library employee continue to process the library card application, he approached the defendant after she was given her library card and she continued to be upset, and "since he was in charge of the branch, it was his responsibility to ask patrons who engage in behavior deemed disruptive by the library staff to leave."  Id. at 162-63, 111 P.3d at 57-58 (quotation marks and ellipsis omitted).  When the defendant would not "tone it down[,]" the manager asked her to leave but she did not, so he called the police.  Id. at 163, 111 P.3d at 58.  After calling the police he "probably wandered around the library trying to continue his work[,]" and the defendant "used the library quietly until the police arrived."  Id. (quotation marks and brackets omitted).

Unlike the current case, in Moser there was no evidence of physical inconvenience by anyone due to the defendant's conduct to support the disorderly conduct conviction based on unreasonable noise.

In this case, based on HRS § 711-1101(1)(d), *i.e.* creating a hazardous or physically offensive condition, McMullen's testimony establishes that Kaeo's conduct of chaining himself to others and lying in the driveway by the MECO gate blocked the convoy from reaching the highway and delayed the transport for three hours.  The convoy consisted of four vehicles, three trucks, and several mechanics trucks, with approximately twenty workers involved in the transport convoy. In short, those involved with the transport convoy were physically inconvenienced because Kaeo was lying on the driveway between the MECO gate and the highway.

17

Given the record in this case, there is sufficient evidence to support the District Court's conclusion that the approximately twenty individuals involved with the transport convoy were "members of the public" within the meaning of HRS § 711-1101 and that Kaeo intended to cause, or recklessly created a risk of causing, physical inconvenience to them.

Next, Kaeo cites to the commentary for HRS § 711-1101 and suggests that his conduct of lying on the ground did not create a hazardous or physically offensive condition.[11] However, Kaeo's conduct went beyond simply lying on the ground.

McMullen testified that when the trucks attempted to leave the Baseyard and the nose of a truck pulled out just beyond the gate, the protesters approached the trucks, the trucks had to stop, and the protesters were just a few feet from the trucks with the engines of the trucks still running. According to McMullen, some protesters who had black tubes connecting their arms then laid themselves down onto the ground a few feet in front of the trucks. Capt. Holokai testified that Kaeo was one of the protesters attached to others with PVC pipes on the ground approximately five to ten feet away from the transport trucks. Sgt. Kapalehua testified that Kaeo was among the protesters lying on the ground on his back, legs spread, with both of his arms linked to others by PVC pipes, and that Kaeo was very close to the trucks. Sgt. Kapalehua testified the trucks were idling and he could almost feel the heat from the engine while working to get Kaeo detached. Sgt. Kapalehua further testified that because

---

[11] The HRS § 701-1101 commentary provides, in relevant part:

> Subsection (1)(d) is defined to include creation of a hazardous or physically offensive condition by an act not covered by any authorized license or permit. It would prohibit, for example, the use of a "stink bomb," strewing garbage or other noxious substances in public places, and turning off the lights in a public auditorium. Although there is some degree of overlap in some situations between this provision and § 708-828 (criminal use of noxious substances) and § 708-829 (criminal littering), subsection (1)(d) is needed to cover those cases of public annoyance where a private property owner does not wish to file a complaint or where title to property is not clear.

the protesters were non-compliant it would have been hazardous to move Kaeo and the others while they were linked together.

Given the record, there was substantial evidence to support a finding that Kaeo's conduct created a hazardous condition.

Next, Kaeo argues that his conviction should be a violation and not a petty misdemeanor because there is insufficient evidence to sustain a finding that he "intended to cause substantial harm or serious inconvenience." HRS § 711-1101(3) provides that: "Disorderly conduct is a petty misdemeanor if it is the defendant's intention to cause substantial harm or serious inconvenience, or if the defendant persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a violation."

Addressing the issue of intent, the Hawaiʻi Supreme Court has stated that:

> We have consistently held that since intent can rarely be proved by direct evidence, proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the act is sufficient to establish the requisite intent. Thus, the mind of an alleged offender may be read from his acts, conduct, and inferences fairly drawn from all the circumstances.

State v. Kiese, 126 Hawaiʻi 494, 502-03, 273 P.3d 1180, 1188-89 (2012) (citation omitted).

Here, Kaeo drove onto the Baseyard before 7 p.m. on the evening in question, asked McMullen "is this the place where the transport was going to happen?" and then said "you better get ready" and that they "were in for the night." Kaeo also tied his arms to other protesters with PVC pipes and duct tape before lying down in front of the convoy. This made it difficult for MPD officers to physically move Kaeo and the other protesters out of the way without first cutting the PVC pipe. Additionally, the SPEED team had to move slowly in cutting through and removing the PVC pipe to ensure no one was injured. McMullen testified that as a result of the protester's actions, the transport was delayed for three hours. In FOF 60, the District Court found that during cross-examination, Kaeo testified that his intent was, *inter*

19

*alia*, to challenge DKIST developers and that he was hoping for the same result from the month prior where the DKIST transport was stopped but no one was arrested.  Given the record in this case, there was substantial evidence to support Kaeo's conviction as a petty misdemeanor.

### 3.  COL 3

Finally, Kaeo contends that the District Court erred in COL 3 which states, "Defendant argued at trial that the Choice of Evils defense, set forth in Section 703-302, Hawaii Revised Statutes, applies in the instant case.  The Court concludes that the Defendant failed to establish the essential elements of the Choice of Evils defense."[12] (Footnote omitted).  The defendant has the burden of producing some credible evidence of the existence of a justification defense such as choice of evils. See HRS § 703-301 (2014) cmt.  Kaeo argues the evidence clearly shows he had established the essential elements of the choice of evils defense under HRS § 703-302 and that he reasonably believed his actions were necessary to prevent imminent harm to his psyche due to the cultural desecration of Haleakalā from the delivery of DKIST construction materials.

---

[12]  HRS § 703-302 (2014) provides, in relevant part:

> **§703-302 Choice of Evils**.  (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:
>    (a)   The harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;
>    (b)   Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
>    (c)   A legislative purpose to exclude the justification claimed does not otherwise plainly appear.
>    (2)   When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for the actor's conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

In State v. Maumalanga, 90 Hawaiʻi 58, 63, 976 P.2d 372, 377 (1998), the Hawaiʻi Supreme Court held that all of the elements of the choice of evils defense are contained within the express statutory language of HRS § 703-302 and any common law considerations have been superseded by the adoption of the Hawaiʻi Penal Code. For the choice of evils defense to apply, one element on which Kaeo had to present credible evidence was that he believed his conduct "to be necessary to avoid an imminent harm or evil to the actor or to another[.]" HRS § 703-302(1); See also HRS § 703-300 (2014) ("'Believes' means reasonably believes."); State v. Kauhane, 145 Hawaiʻi 362, 374, 452 P.3d 359, 371 (2019) (holding that for the choice of evils defense, although the defendant's belief had to be objectively reasonable, it was also necessary that the defendant in fact subjectively held such a belief).

The commentary to HRS § 703-302 emphasizes that the choice of evils or "necessity" defense is permitted in certain limited situations. See HRS § 703-302 cmt. The commentary also states that "[t]he danger causing the necessity of choosing between evils must be imminent[,]" and explains that blind compliance with a criminal statute is unlikely to be required in the face of an emergency. See HRS § 703-302 cmt; see also U.S. v. Maxwell, 254 F.3d 21, 27 (1st Cir. 2001) (explaining "'imminent harm' connotes a real emergency, a crisis involving immediate danger to oneself or to a third party."); Com. v. Capitolo, 498 A.2d 806, 809 (Pa. 1985) (holding that the necessity defense was not applicable to defendants who had trespassed onto a nuclear power plant, sat down holding hands, and refused to leave, where "[t]heir act of criminal trespass was a deliberate and calculated choice, not an act that was urgently necessary to avoid a clear and imminent danger.").

Here, as the District Court found, Kaeo testified that he had attempted through many other avenues and hearings to stop the telescope construction, and that his claimed harm to Haleakalā as a result of the ongoing construction had been going

on for the last four to five years.  The asserted harm Kaeo sought to avoid had been ongoing and continuous.  Given the record in this case, Kaeo did not establish an emergency or imminent harm under the choice of evils defense.

The District Court did not err in concluding that Kaeo failed to establish the essential elements of the choice of evils defense.

### III. Conclusion

Based on the foregoing, the "Trial Decision and Order" filed on June 15, 2016, and the "Judgement and Notice of Entry of Judgment" filed on June 29, 2016, by the District Court of the Second Circuit, are affirmed.

On the briefs:

Hayden Aluli,
for Defendant-Appellant.

Renee Ishikawa Delizo,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

DISSENTING OPINION by Nakasone, J.

With respect to the Majority's affirmance of COL 2, I dissent because I believe there was insufficient evidence of Kaeo's intent that his conduct cause the specific result of physical inconvenience to a member or members of the public, or with reckless disregard that his conduct might produce such a result. I respectfully disagree with the majority's conclusion that the "approximately 20 individuals involved with the transport convoy were 'members of the public' within the meaning of HRS § 711-1101[.]"

**"Member or members of the public" means the general public**

HRS § 711-1101(1) (2014), the disorderly conduct statute provides:

> (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm <u>by a member or members of the public</u>, or recklessly creating a risk thereof, the person:
>
> > (a) Engages in fighting or threatening, or in violent or tumultuous behavior;
> >
> > (b) Makes unreasonable noise;
> >
> > (c) Subjects another person to offensively coarse behavior or abusive language which is likely to provoke a violent response;
> >
> > (d) Creates a hazardous or physically offensive condition by any act which is not performed under any authorized license or permit; or
> >
> > (e) Impedes or obstructs, for the purpose of begging or soliciting alms, any person in any public place or in any place open to the public.

(Emphasis added). As explained <u>infra</u>, I believe that pursuant to statutory construction principles and the Commentary on HRS § 711-1101, the words "the public" in the disorderly conduct statute have an ordinary meaning, and that the HRS § 711-1100 (2014 & Supp. 2015) definition of the adjective "public" as "affecting or likely to affect a substantial number of persons," does not apply to the phrase "member or members of the public" in the disorderly conduct statute.

A "rational, sensible and practicable interpretation of

a statute is preferred to one which is unreasonable or impracticable, because the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." In re Doe, 90 Hawaiʻi 246, 251, 978 P.2d 684, 689 (1999) (internal citations, brackets and quotation marks omitted)).  Using the HRS § 711-1100 definition of the adjective "public" for the noun "the public" in the disorderly conduct statute leads to illogicality. Applying this definition to the disorderly conduct charge here, the language in the Complaint would read, "Samuel K. Kaeo, with intent to cause substantial harm or serious physical inconvenience by a member or members of the ['affecting or likely to affect a substantial number of persons'], or reckless creating a risk thereof . . . ."  See Count 3 of the Complaint (quoting HRS § 711-1100 definition of "public").  This does not make sense.  In addition, using the HRS § 711-1100 definition of the adjective "public" in the definitions of "private place"[1] and "public place"[2] that also appear in that section and contain the term "the public," similarly leads to illogical and redundant results.

"It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute."  Franks v. City and County of Honolulu, 74 Haw. 328, 330, 843 P.2d 668, 669 (1993) (citations omitted).  If the words "the public" in the disorderly conduct statute mean "affecting or likely to affect a substantial number of persons[,]" then the statute cannot logically be

---

[1]	The "private place" definition in HRS § 711-1100 provides, *inter alia*, that it "does not include a place to which the public or a substantial group thereof has access." (Emphasis added).

[2]	The "public place" definition in HRS § 711-1100 provides, *inter alia*, that it means "a place to which the public or a substantial group of persons has access . . . ." (Emphasis added).

2

employed in a case where only one person, or a single member of the public, is affected. HRS §§ 711-1100, 711-1101. The disorderly conduct statute, however, clearly does apply where even a single "member" of "the public" is inconvenienced or alarmed by a defendant's conduct. Conversely, if the words "the public" in the disorderly conduct statute mean "affecting or likely to affect a substantial number of persons," then the plural "members of the public" is redundant. The plural form "members" is unnecessary and superfluous if "public" already means a substantial number of persons. See HRS §§ 711-1100, 711-1101. For these reasons, applying HRS § 711-1100's definition of the adjective "public" to the words "the public" in the disorderly conduct statute, renders the words "member or members" redundant or superfluous, leading to an illogical construction and absurd result.[3] HRS § 711-1100 acknowledges that its definitions apply "<u>unless</u> a different meaning is plainly required, or the definition is otherwise limited . . . ." (Emphasis added). For the disorderly conduct statute, a different meaning of "the public" other than the definition of "public" in HRS § 711-1100 is plainly required.

The Commentary on HRS § 711-1101 "may be used as an aid in understanding the provisions of the [Hawaiʻi Penal] Code." HRS § 701-105 (2014); see State v. Teale, 139 Hawaiʻi 351, 355-56, 390 P.3d 1238, 1242-43 (2017) (utilizing the commentary to HRS § 711-1101 as an aid to determine the meaning of "tumultuous"

---

[3] The same absurd interpretation results when applying the default "public" definition in HRS § 711-1100 as an adjective, to other public order offenses in HRS Chapter 711 that use the term "the public" as a noun. See e.g. HRS § 711-1101(e) offense of Begging or Soliciting ("Impedes or obstructs, for the purpose of begging or soliciting alms, any person in any public place or in any place open to the public.") (emphasis added); HRS § 711-1107(1) offense of Desecration ("(1) A person commits the offense of desecration if the person intentionally desecrates: (a) Any public monument or structure; (b) A place of worship or burial; or (c) In a public place the national flag or any other object of veneration by a substantial segment of the public.") (emphasis added); HRS § 711-1111(3) offense of Violation of Privacy in the Second Degree ("'Public place' means an area generally open to the public, regardless of whether it is privately owned, and includes but is not limited to streets, sidewalks, bridges, alleys, plazas, parks, driveways, parking lots, buses, tunnels, buildings, stores, and restaurants.") (emphasis added).

3

in the disorderly conduct statute subsection (1)(a)).  The
Commentary to HRS § 711-1101 pertinently provides:

> Subsection (1)(a) is a standard clause in disorderly conduct
> legislation, aimed at actual fights and at other behavior
> <u>tending to threaten the public generally, for this section</u>
> <u>requires public alarm, etc., as distinguished from the</u>
> <u>private alarm which may accompany assault.  This is an</u>
> <u>important point</u>.  A person may not be arrested for
> disorderly conduct as a result of activity which annoys only
> the police, <u>for example</u>.  Police officers are trained and
> employed to bear the burden of hazardous situations, and it
> is not infrequent that private citizens have arguments with
> them.  <u>Short of conduct which causes "physical inconvenience</u>
> <u>or alarm to a member or members of the public" arguments with</u>
> <u>the police are merely hazards of the trade, which do not</u>
> <u>warrant criminal penalties</u>.

(Emphases added) (footnote in original omitted).  The Commentary
on HRS § 711-1101 emphasizes as an "important point" that the
statute is "aimed" at behavior directed to "the public
generally."  Id.  The Commentary clarifies that subsection (a)
encompasses fighting or threatening behavior that threatens or
tends to threaten *the public generally*, and the statute does not
include fighting or threatening directed to private individuals.
See id.  In an assault charge, a defendant's fighting is targeted
to a private individual and may cause "private alarm," as
distinguished from the public alarm required for disorderly
conduct.  See id.  To fall within the scope of the disorderly
conduct statute, a defendant's fighting behavior must be targeted
*to the public generally* to establish the required public alarm
element.  The Commentary cites the police as an "example" of a
group or a category of persons that is excluded from "the public
generally[.]"  Id.  In noting that the police are but one example
of an exclusion, the Commentary does not suggest that the police
are the only example.  Other categories of persons or groups may
also be excluded from "the public generally," depending on the
circumstances.

The statutory focus on specifically targeting conduct
that impacts *the public generally* is consistent with the Model
Penal Code (**MPC**).  "[I]t is appropriate to look to the Model
Penal Code and its commentary for guidance" when interpreting

criminal statutes derived from the MPC.  State v. Aiwohi, 109
Hawaiʻi 115, 126, 123 P.3d 1210, 1221 (2005); see Teale, 139
Hawaiʻi at 355-56, 390 P.3d at 1242-43.  Hawaiʻi's disorderly
conduct statute is based on MPC § 250.2, which provides:

> § 250.2 Disorderly Conduct
>
> (1) Offense Defined.  A person is guilty of disorderly
> conduct if, with purpose to cause public inconvenience,
> annoyance or alarm, or recklessly creating a risk thereof,
> he:
> (a) engages in fighting or threatening, or in
> violent or tumultuous behavior; or
> (b) makes unreasonable noise or offensively
> coarse utterance, gesture or display, or addresses abusive
> language to any person present; or
> (c) creates a hazardous or physically offensive
> condition by any act which serves no legitimate purpose of
> the actor.
>
> "Public" means affecting or likely to affect persons in a
> place to which the public or a substantial group has access;
> among the places included are highways, transport
> facilities, schools, prisons, apartment houses, places of
> business or amusement, or any neighborhood.

Model Penal Code § 250.2 (Am. Law Inst. 1980) (asterisk removed)
(first emphasis in original and second emphasis added).  MPC §
250.2 pertinently explains that:

> The Model Code does not authorize police intrusion into the
> home or place of business to control private misbehavior
> simply because it may be offensive to others.  Instead, the
> offense is limited to persons who act purposely or
> recklessly with respect to public annoyance or alarm.  Of
> course, if private offensive conduct rises to the level of
> assault or other crime, it may be punished elsewhere in the
> Model Code.

Id. § 250.2 cmt. (Emphases added).  The MPC clarifies that the
disorderly conduct statute is "limited" to conduct that has the
specified impact of "public inconvenience or alarm" and excludes
"private misbehavior."  Id.  Further, the MPC notes that the
disorderly conduct statute does not punish such behavior that
occurs in private places such as a "home or place of business"
and points out that if such private conduct rises to the level of
crime, it may be punished via other MPC statutes.  See id.

Applying an ordinary meaning of "the public" to the
disorderly conduct statute leads to a rational and practical
construction that comports with the Commentary to the statute.

5

The words "the public" are ubiquitously used, and have an ordinary, common meaning.  In conducting a plain meaning analysis, the words of a statute "must be taken in their ordinary and familiar signification," with regard "to their general and popular use."  Wells Fargo Bank, N.A. v. Omiya, 142 Hawaiʻi 439, 449, 420 P.3d 370, 380 (2018) (quotation marks and citations omitted).  A court may also "resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined."  Id. at 449-50, 420 P.3d at 380-81 (quotation marks and citations omitted).  In standard English usage, "the public" means "[t]he community or people as a whole" or "ordinary people in general."  *Public*, The American Heritage Dictionary (2d college ed. 1982); *The public*, The New Oxford American Dictionary (2001).  "The public is also the people who do not belong to a particular group or organization."  *Public*, Cambridge Dictionary, (Cambridge University Press 2010), http://dictionary.cambridge-.org/us/dictionary/english/public.  Thus, an ordinary meaning should apply to the term "the public" as used in the disorderly conduct statute, referring to the community or ordinary people as a whole or in general, not belonging to a group or organization.  See Wells Fargo Bank, N.A., 142 Hawaiʻi at 449, 420 P.3d at 380.  As applied to this case, the approximately 20 individuals involved in the DKIST transport convoy were members of a select group, rather than members of the community as a whole or the general public.

> **Insufficient evidence of Kaeo's intent to cause the result prohibited by the statute to the general public**

In State v. Jendrusch, 58 Haw. 279, 281-82, 567 P.2d 1242, 1244 (1977),[4] the supreme court held:

---

[4]    In Jendrusch, the supreme court reversed the defendant's disorderly conduct conviction and remanded for a dismissal of the complaint that did not contain "the averment that defendant's conduct resulted or threatened to result in physical inconvenience" and only stated "with intent to cause public inconvenience . . . ."  58 Haw. at 280, 567 P.2d at 1243.  The Jendrusch Court focused on the sufficiency of the charge rather than

(continued...)

> An essential element of an offense under this statute is an intent or a reckless disregard on the part of the defendant that his conduct will have a specific result. <u>That consequence which the statute seeks to prevent is actual or threatened physical inconvenience to, or alarm by, a member or members of the public</u>. The intent to produce this particular effect, or recklessly creating a risk thereof, is an essential ingredient of the conduct proscribed by the statute.

(Emphasis added) (footnote omitted). In this case, there was insufficient evidence of Kaeo's intent to cause the specific result prohibited by the statute, of physical inconvenience *to a member or members of the general public*. See <u>State v. Faulkner</u>, 64 Haw. 101, 104, 637 P.2d 770, 773 (1981); <u>State v. Moser</u>, 107 Hawai‘i 159, 111 P.3d 54 (App. 2005); <u>State v. Leung</u>, 79 Hawai‘i 538, 904 P.2d 552 (App. 1995); <u>State v. Nakasone</u>, 1 Haw. App. 10, 612 P.2d 123 (App. 1980).

Three years after the <u>Jendrusch</u> Court's explanation of required result to prove disorderly conduct, this court, relying on <u>Jendrusch</u>, 58 Haw. at 281-82, 567 P.2d at 1244, reversed a disorderly conduct conviction for unreasonable noise under HRS § 711-1101(1)(b) for insufficient evidence in the 1980 decision in <u>Nakasone</u>, 1 Haw. App. 10, 612 P.2d 123. The evidence in <u>Nakasone</u> showed that a police officer who was getting a cup of coffee at a "fairly crowded" Beretania Street McDonald's restaurant approached the defendant who was talking to some customers. 1 Haw. App. at 11, 612 P.2d at 123-24. "Without checking with the customers to determine if they were being inconvenienced," the officer told the defendant "to stop bothering the customers if he didn't know them." <u>Id.</u> The defendant began yelling at the officer and did not heed the officer's numerous commands to quiet down and warning that he would be arrested. <u>Id.</u> at 11, 612 P.2d at 124. A crowd of "unspecified size" began to gather, and the defendant was arrested for disorderly conduct. <u>Id.</u> at 12, 612 P.2d at 124. In concluding there was insufficient evidence that the defendant acted intentionally or recklessly with regard to

_____

⁴(...continued)
sufficiency of the evidence.

the required result, this court noted that the "State offered no other competent evidence of any actual or threatened physical inconvenience to, or alarm by, a member or members of the public." Id. at 12, 612 P.2d at 124. Thus, in Nakasone, the members of the public were the patrons in the McDonald's restaurant, whom this court concluded were not shown to have been inconvenienced by the defendant's conduct.

The following year, the supreme court reversed a disorderly conduct conviction for unreasonable noise under HRS § 711-1101(1)(b) in its 1981 decision in State v. Faulkner. In Faulkner, the incident occurred during the late afternoon near the Honolulu Zoo, when the defendant called the police for assistance when his car windshield was damaged after an angle iron had been thrown at it by another male. 64 Haw. at 104, 637 P.2d at 773. The defendant became loud, swearing, and belligerent at the police due to his frustration with the police investigation. Id. at 103-04, 637, P.2d at 773. A crowd began to gather, traffic was slowing down, as passerby and bystanders were looking to see what was going on. Id. at 103, 637 P.2d at 773. The police arrested the defendant for disorderly conduct. Id. at 103, 637 P.2d at 772. In concluding that there was insufficient proof of the required element of the result of "actual or threatened physical inconvenience to, or alarm by, a member or members of the public," the Faulkner Court reasoned that:

> [T]here has been no evidence presented by the State that the defendant's conduct had the effect of causing actual physical inconvenience to any member of the public. Neither, in the circumstances, was it likely that any member of the public would have been physically disturbed or alarmed by the noise created by the defendant. Pedestrians stopping of their own volition to satisfy their curiosity, or motorists slowing down for the same reason, cannot be said to be physically inconvenienced or alarmed within the meaning of the statute.

Id. at 104-05, 637 P.2d at 773-74. Thus, in Faulkner, the members of the public were the passersby, bystanders, and passing motorists, none of whom the evidence showed were physically inconvenienced or alarmed by the defendant's conduct.

8

Fourteen years later, this court reversed a disorderly conduct conviction for unreasonable noise under HRS § 711-1101(1)(b) in its 1995 decision in State v. Leung. In Leung, the defendant was loudly and repeatedly yelling and cursing a theater manager and police officers after the theater manager had detained defendant and his friends after they were identified as possible persons who had caused a loud popping noise in the theater. 79 Hawaiʻi at 540-42, 904 P.2d at 554-56. The defendant did not comply with the officer's repeated requests to calm down and not raise his voice; and the defendant continued to shout obscenities even after the officers warned he would be arrested. Id. There were around a hundred patrons in the area, including patrons leaving the theater and patrons waiting outside for the next show, who were looking into the lobby where defendant was being detained, to see what was going on. Id. at 541, 904 P.2d at 555. The defendant was arrested for disorderly conduct. Id. This court reversed the conviction because the evidence did not sufficiently establish "that when Defendant addressed the theater manager and the police concerning what he believed to be an unjustified detention, his intent was to cause physical inconvenience or alarm by members of the public or that he recklessly created a risk thereof." Id. at 545, 904 P.2d at 559. The Leung court cited Jendrusch's result element language that "[t]here must have been the intent by the defendant to cause physical inconvenience to, or alarm by, a member or members of the public." Id. at 544, 904 P.2d at 558 (emphasis and quotation marks omitted). This court reasoned that:

> Finally, there is no evidence that Defendant addressed anyone other than the manager and the police. The State's brief, itself, states that "Defendant's . . . conduct was directed at the theater manager, as well as the officers," and that Defendant "acted belligerently" and in a "loud, . . . disorderly" voice. Officer Johnson plainly indicated that he arrested Defendant after Defendant ignored his warning regarding Defendant's repeated use of profanity at him and the other officers. This type of conduct is not an adequate basis for a charge under HRS § 711-1101, but would rather constitute a possible charge under HRS § 711-1106 . . . . The officers' testimonies indicated that all of Defendant's statements pertained to Defendant's belief that he was being unjustly detained and that the alleged profanity was aimed only at the officers and the manager,

9

                    not at the public or any member of the public generally.

Id. at 558-59, 904 P.2d at 544-45 (emphases added).  Thus, in
Leung, the members of the public were the approximately a hundred
patrons inside and outside the theater, none of whom the evidence
showed were the target of the defendant's outburst.  Instead, the
evidence reflected that the defendant's intent and conduct were
"aimed only at the officer and the manager," whom the Leung court
did not consider to be the members of the public.  Id.

        Ten years later in its 2005 decision in State v. Moser,
this court relied on Faulkner, Leung, and Nakasone, *inter alia*,
in reversing a defendant's conviction for disorderly conduct for
unreasonable noise under subsection (1)(b).  The evidence in
Moser consisted of the defendant raising her voice at library
employees in a public library.  The Moser court concluded that
defendant's conduct did not constitute unreasonable noise, and
reasoned that:

> [T]here is no evidence in the record that Moser addressed
> anyone other than Paik [(library employee)] and Huber
> [(library manager)] on the occasion in question or intended
> to physically inconvenience or alarm any member of the
> public by speaking loudly.  Indeed, it is unclear whether
> any other patron was in the library that day and, if so,
> whether it was the raising of Moser's voice or the dialogue
> between Moser and Huber that attracted the patron's
> attention.  We therefore conclude, based on the case law,
> that there was insufficient evidence that Moser acted with
> any "intent to cause physical inconvenience or alarm by a
> member or members of the public[.]"

107 Hawaiʻi at 175-76, 111 P.3d at 70-71 (brackets and quotation
marks in original).

        The Moser court identified the HRS § 711-1100
definition of the adjective "public" as "affecting or likely to
affect a substantial number of persons" in conjunction with the
disorderly conduct statute.  Id. at 171, 111 P.3d at 66.  The
Moser court, however, did not expressly apply this definition in
its evidentiary sufficiency analysis.  The court's reference to
"any member of the public" in the quoted passage above, was
referring to "whether any other patron was in the library that
day" or "anyone other than Paik and Huber[.]"  Id. at 175-76, 111

P.3d at 70-71. This focus on whether "any member of the public" besides the two library employees were present suggests that this court did not apply the HRS § 711-1100 definition of "public" as "substantial number of persons," and instead applied the ordinary meaning of "the public" that includes even a single member of the public or a single patron of the library.

Disorderly conduct precedent in Hawaiʻi has required that the State show that the defendant intended to cause, or recklessly disregard the risk of causing, the specific prohibited result of inconvenience or alarm by a member or members of the general public. See Faulkner, 64 Haw. 101, 637 P.2d 770; Moser, 107 Hawaiʻi 159, 111 P.3d 54; Leung, 79 Hawaiʻi 538, 904 P.2d 552; Nakasone, 1 Haw. App. 10, 612 P.2d 123. There is no substantial evidence of this required element of proof in this case.

The record reflects that Kaeo's intent was to stop the DKIST transport convoy from delivering telescope components to Haleakalā. Kaeo's conduct was specifically directed at preventing a select group of individuals, the DKIST transport convoy, from egress out of the private property of the Central Maui Baseyard[5] onto a public access road leading to Mokulele Highway. Rather than constituting members of the general public, the DKIST transport convoy workers constituted a specific, select group of individuals engaged in a private transport at the time Kaeo engaged in the conduct at issue in this case. The photographs in evidence at trial and MPD Sgt. Russell Kapalehua's testimony showed that Kaeo's location was not in the public access road, but on the side of the road, laying down in the driveway of the private baseyard. The record does not reflect that any members of the general public were inconvenienced or recklessly placed at risk of inconvenience by Kaeo's conduct, which occurred late at night at approximately 10:30 p.m., in the driveway of a private business.

The disorderly conduct statute is specifically directed

---

[5] MPD Captain Clyde Holokai testified that the Central Maui Baseyard was a privately owned commercial enterprise.

11

at "behaviors tending to threaten the public generally," and the Commentary to HRS § 711-1101 counsels an "interpretation of the statute that is far more narrow than broad."[6]  Teale, 139 Hawaiʻi at 356, 390 P.3d at 1243 (citing the Commentary to HRS § 711-1101)(quotation marks and brackets omitted).  For all of the reasons set forth above, there was insufficient evidence of the required prohibited result to establish disorderly conduct, that Kaeo's conduct caused physical inconvenience to members of the general public.  I would hold that the conviction must be reversed.

/s/ Karen T. Nakasone
Associate Judge

---

[6]  In Teale, the Hawaiʻi Supreme Court observed that conduct that does not fall into the scope of the disorderly conduct statute, may be covered elsewhere in the Penal Code.  139 Hawaiʻi at 360-61, 390 P.3d at 1247-48 (noting that "other statutes, ordinances, and rules may have been relevant to the conduct in this case.").  See also Leung 79 Hawaiʻi at 543, 545, 904 P.2d at 557, 559 (noting that "[t]he State chose not to charge Defendant with harassment of the theater manager or of any of the police officers."); Jendrusch, 58 Haw. at 282 n.3, 567 P.2d at 1245 n.3 (noting that the "abusive language, coupled with the outrageous physical conduct of the defendant in this case, would have warranted a charge of harassment under HRS § 711-1106.").

In this case, the State did initially avail itself of other charging options in the Hawaiʻi Penal Code, and charged, *inter alia*, Refusal to Provide Ingress or Egress, in violation of HRS § 852-1 (2014) in Count 1. HRS § 852-1, proscribes conduct of obstructing ingress to and/or egress from any public or private place, and intentionally, knowingly or recklessly refusing or wilfully failing to move as directed by a law enforcement officer. This charge was dismissed before trial, however; and the record does not reflect why the State chose to dismiss this count.  Unlike a disorderly conduct charge, the charge of Refusal to Provide Ingress or Egress does not require proof that a defendant's conduct cause the specific result to members of the general public.